To be argued by
LEON H. TRACY
(15 minutes)

SUPREME COURT OF THE STATE OF NEW YORK
APPELLATE DIVISION : SECOND DEPARTMENT
----------------------------------------x
THE PEOPLE OF THE STATE OF NEW YORK

                      Respondent,

                -against-

RASHAWN PENDER,

              Defendant-Appellant.
----------------------------------------x

:    HEARD ON THE
     ORIGINAL RECORD

:

:    Ind. No. 2822/08
   Docket No. 2009-08850

:     Nassau County

## BRIEF FOR DEFENDANT-APPELLANT

LEON H. TRACY
Attorney for Appellant
366 North Broadway, Suite 410-D9
Jericho, N.Y. 11753
(516) 942-4233

# TABLE OF CONTENTS

Page

STATEMENT PURSUANT TO RULE 5531............................4

PRELIMINARY STATEMENT......................................5

QUESTIONS PRESENTED........................................7

STATEMENT OF FACTS

Introduction..............................................8

PRE-TRIAL PROCEEDINGS

Suppression Hearing 6/19/09 - 6/24/09

People's Case.............................................8

Defendant's Case.........................................16

Hearing Decision 4/27/09.................................17

THE TRIAL

People's Case............................................18

Defendant's Case.........................................30

Verdict and Sentence.....................................33

ARGUMENT

## ˙POINT ONE

THE PEOPLE FAILED TO PROVE THE DEFENDANT COMMITTED THE CRIMES CHARGED AS THE EVIDENCE WAS OF INSUFFICIENT WEIGHT, AND THE TESTIMONIES OF THE WITNESSES WERE INCREDIBLE, INCONSISTENT, AND UNRELIABLE, THE VERDICT BEING UNSUPPORTED AND AGAINST THE WEIGHT OF THE EVIDENCE, IN VIOLATION OF THE DEFENDANT'S CONSTITUTIONAL RIGHTS TO BE CONVICTED ONLY WHERE GUILT HAS BEEN ESTABLISHED BEYOND A REASONABLE DOUBT.........34

Page

## POINT TWO

THE WRITTEN STATEMENT MADE BY THE DEFENDANT SHOULD HAVE
BEEN SUPPRESSED AS THE EVIDENCE PROFFERED BY THE PEOPLE
DID NOT ESTABLISH THAT THE DEFENDANT WAS GIVEN HIS
MIRANDA WARNINGS.........................................45

## POINT THREE

THE UNDULY HARSH AND EXCESSIVE SENTENCES IMPOSED ON
THE DEFENDANT SHOULD BE REDUCED IN THE INTEREST OF
JUSTICE..................................................59

CONCLUSION...............................................57

SUPREME COURT OF THE STATE OF NEW YORK
APPELLATE DIVISION : SECOND DEPARTMENT
----------------------------------------x
THE PEOPLE OF THE STATE OF NEW YORK,       :

                Respondent,       :

        -against-       :

RASHAWN PENDER,       :

          Defendant-Appellant.   :
----------------------------------------x

### STATEMENT PURSUANT TO RULE 5531

1. The Indictment Number in the Court below is 2822/08.

2. The Docket Number is 2009-08850.

3. The full names of the original parties are The People of the State of New York against Rashawn Pender. Rashawn Pender is the only party to this appeal.

4. This action was commenced in the County Court, Nassau, by the filing of an indictment December 15, 2008.

5. This appeal is from a judgment convicting appellant, after trial by jury, as follows: murder in the second degree; attempted robbery in the first degree; and criminal possession of a weapon in the second degree (two counts).

6. This is an appeal from a judgment rendered September 1, 2009 (Robbins, J.).

7. Appellant has been granted poor person relief and this appeal is not being perfected by the appendix method.

4

## PRELIMINARY STATEMENT

This is an appeal from a judgment of the County Court, Nassau County, rendered on the 11th day of September 2009, after a trial by jury, convicting the defendant as follows: count two, murder in the second degree, a class A-1 violent felony, P.L. §125.25, Subdivision 3; count three, attempted robbery in the first degree, a class C felony, P.L. §110/160.15, Subdivision 2; count five, criminal possession of a weapon in the second degree, a class C felony, P.L. §265.03, Subdivision 3; and count six, criminal possession of a weapon in the second degree, a class C felony, P.L. §265.03, Subdivision 1(b) (T. 783 - 785).1

The defendant was sentenced as a persistent felony offender (S. 17): count two, murder in the second degree, 25 years to life; count three, attempted robbery in the first degree, 16 years to life; count five, criminal possession of a weapon in the second degree, 16 years to life; and count six, criminal possession of a weapon in the second degree, 16 years to life. The sentences are to run concurrently with each other, and a period of post-release supervision was imposed on the three C felonies (S. 19 - 20). Restitution was ordered by civil judgment in the amount of

---

1 Numerical references preceded by "H" are to the hearing minutes; those preceded by "T" are to the trial minutes; and those preceded by "S" are to the sentence minutes.

$2,149.62 for the benefit of the Crime Victims Board. There was a mandatory surcharge of $250, a $50 DNA fee, and a $25 crime victims' assistance fee imposed by civil judgment (S. 20).

Timely notice of the appeal was filed. The Court granted the appellant leave to prosecute the appeal as a poor person on original papers and typewritten briefs. By Order, January 4, 2010, Leon H. Tracy, Esq. was assigned as counselor on appeal.

Upon information and belief, no application has been made for a stay or bail pending appeal, and appellant is presently incarcerated, pursuant to the judgment herein appealed, at Clinton Correctional Facility, Dannemora, New York.

## QUESTIONS PRESENTED

1. WHETHER THE PEOPLE FAILED TO PROVE THE DEFENDANT COMMITTED THE CRIMES CHARGED AS THE EVIDENCE WAS OF INSUFFICIENT WEIGHT, AND THE TESTIMONIES OF THE WITNESSES WERE INCREDIBLE, INCONSISTENT, AND UNRELIABLE, THE VERDICT BEING UNSUPPORTED AND AGAINST THE WEIGHT OF THE EVIDENCE, IN VIOLATION OF THE DEFENDANT'S CONSTITUTIONAL RIGHTS TO BE CONVICTED ONLY WHERE GUILT HAS BEEN ESTABLISHED BEYOND A REASONABLE DOUBT.

2. WHETHER THE WRITTEN STATEMENT MADE BY THE DEFENDANT SHOULD HAVE BEEN SUPPRESSED AS THE EVIDENCE PROFFERED BY THE PEOPLE DID NOT ESTABLISH THAT THE DEFENDANT WAS GIVEN HIS MIRANDA WARNINGS.

3. WHETHER THE UNDULY HARSH AND EXCESSIVE SENTENCES IMPOSED ON THE DEFENDANT SHOULD BE REDUCED IN THE INTEREST OF JUSTICE.

7

## STATEMENT OF FACTS

Introduction

The people maintain that the defendant, Rashawn Pender, aided and abetted by others, on October 25, 2008, attempted to commit a robbery, causing the death of Andre Scott, and a weapon was used to shoot the victim.

### PRE-TRIAL PROCEEDINGS

Suppression Hearing 6/19/09 - 6/24/09

People's Case

According to the people, Detective Edward Hoctor, Shield No. 854, responded on October 25, 2008, about 12:30 A.M., to a shooting at 45 Jackson Avenue, Hempstead, near Terrace Avenue, to a three story apartment complex. He went through the lobby where he encountered police officers near the body of a black male, Andre Scott. Scott was found lying at the bottom of a stairwell in a pool of blood (H. 17 - 20).

Hoctor was informed that the shooting had occurred on floor B, and the victim had been dragged down the staircase, leaving a trail of blood. On floor B, Hoctor saw signs of the shooting, and he noted an east/west hallway with a little bend, a zigzag to the east side, of the hall. Some of the witnesses were handcuffed to be taken to headquarters for interviews. Beer bottles, hats, plastic cups, and a white Styrofoam cup were recovered by the police. The cup was forwarded to the

Latent Fingerprint Section for testing (H. 20 - 21, 66 - 67, & 69).

At the scene, Hoctor interviewed Lucia Vance who explained that a party had been held for her nephew on floor B and that she had been in the hall with others, including children. She had seen a group from Terrace Avenue, including the defendant - -known as "Ra Ra," Derek Cullum --known as "D-nice," Theron Rhodes --known as "Junior," Slick, G-Low, and Brian Allen. Ricky Dingle and Angelo McDeegan were also on the floor. Vance did not see the defendant with a gun or having anything to do with the robbery and homicide (H. 22, 71, & 77).

Vance also had observed five or six males from Elmont, among them Andre Scott, in the presence of three females. The males from Terrace Avenue left the hallway and when they returned, about 30 minutes later, they had two guns. There was tension between the males from Terrace and those from Elmont. Vance claimed that the two guns were not the ones used in the shooting as she had them in view when she heard two or three shots fired (H. 22 - 23 & 73). Hoctor was told by Vance to speak with "Junior" and "Ra Ra" to find out what happened (H. 91).

Vance had seen Rhodes and Allen with guns about the time the shots were fired (H. 77 - 78). In addition to Scott being fatally shot, Vance's niece had a graze wound and Daniel Smith

9

was shot in the arm (H. 23). Hoctor spoke with Daniel Smith and Greg Bailey, friends of the deceased at the scene. Smith was at the east end of the hallway, and he saw the defendant in the hallway at the time of the incident. About 1:30 A.M., at the Homicide Squad, Smith identified the defendant from a photo array. Smith never mentioned being shot by the defendant or that the shooter wore a red hoodie (H. 24, 26 - 27, 87, & 90).

Bailey claimed that he was walking down the hallway with Scott, having been invited to the party, and they were confronted by a group of males when shots were heard. On hearing shots, he began to run eastward. Hoctor also spoke with Bailey at the Homicide Squad later in the morning, and he noted Bailey was upset as his friend Scott was killed (H. 25 & 26). Bailey had never mentioned that someone in a red hoodie fired a weapon (H. 135).

Surveillance videos were recovered from 45 Jackson, 100 Terrace, and 67 Terrace Avenues. A few minutes before midnight, the 45 Jackson Avenue tape showed Rhodes leaving the building, but the defendant was not identified leaving the building nor was any other person. The tape from the 100 Terrace Avenue showed the defendant entering the location, October 25, 2008, 12:23 A.M. wearing a red hooded sweatshirt, taking the elevator to his apartment on the fifth floor. Within two minutes, the tape showed the defendant exiting his apartment in a gray

10

sweatshirt (H. 30 - 33 & 74 - 75).

On October 30, 2008, Detective Mark Garry, Shield No. 971, transported Bailey from his home to the Homicide Squad to view a photo array, and he identified the defendant. Bailey related to Garry and Hoctor, that at the time of the shooting, he went past a group of males, including the defendant, when he heard someone yell, "Give it up." Then shots were fired, and Bailey fled down the staircase near the apartment. The deceased was Bailey's friend (H. 169 -175).

Bailey related to Garry that he had seen the defendant at the bend in the hallway as he passed. He was next to the decedent when he heard "Give it up" and he heard a gunshot. Bailey never mentioned that he saw the defendant or anyone else with a gun. He had not known the defendant prior to making the identification. Bailey had been in police custody when he made the identification of the defendant. Garry did not know if "Witness #4" had asked for consideration in exchange for his identification (H. 184 - 187 & 195).

On November 4, 2008, Hoctor and Detective Richard Lawson, showed a photo array to "Witness #3," and he identified the defendant as having worn a red hoodie and shooting a gun on floor B, at the time of Scott's murder (H. 33 - 34 & 141).

On November 11, 2008, Hoctor re-interviewed Smith after several unsuccessful attempts to do so, claiming the time with

11

Smith had been brief, but it was actually 13 hours. Smith had not provided much information during what Hoctor claimed were initial brief interviews as he had been upset about the death of Scott. Scott's family had asked Smith to help the police, and he had agreed to be re-interviewed. During the second photo array procedure, Smith named the defendant, as wearing a red hoodie and being the shooter (H. 37 - 41 & 101).

Also on November 11, 2008, Hoctor received information from the Latent Fingerprint Section that the white Styrofoam cup that was recovered, in a pool of blood, at the scene had a latent fingerprint impression, identified as belonging to the defendant (H. 42). The police were given instructions to take the defendant into custody (H. 43).

On November 18, 2008, 10:00 P.M., the defendant was in front of 100 Terrace Avenue when he was arrested by Detective Thomas Salerno, Shield No. 33, and other detectives. The defendant was transported to the Homicide Squad. There was no conversation during the ride, and no threats or promises were made to the defendant (H. 158 - 162).

The defendant was interviewed by Detective James J. Hendry, Shield No. 897, and Detective Michael O'Leary on November 18, 2008, 10:28 P.M. Hendry read the defendant his Miranda rights from a printed card. The defendant signed the PDC 233 card that he was willing to speak with the officers,

12

and they signed too. The card had the date May 18, 2008 (sic) and the time on it, added after the fact, but Hendry claimed that nothing was added to the card after November 18, 2008 (H. 196 - 203). He did admit that the date and time were added after the defendant signed the card (H. 203 & 230).

Hendry took pedigree information and discussed the events of October 24, 2008 and October 25, 2008 related to the incident. Initially, the defendant denied being at the scene. When he was confronted with information about the video and witnesses of his presence at the scene, he told the officers that he had gone to the party and met the man running it, getting a beer from him. Hendry used O'Leary's notes to refresh his memory as he testified (H. 205 - 208).

The defendant related that Cullum had gone to obtain a gun, and they went to rob a guy, not from Hempstead. It was claimed by the defendant that two or three shots rang out, and all he heard was, "You got the wrong guy, you shot the wrong guy." (H. 210) Although Hendry made reference to the defendant's use of the word "they," he acknowledged that at no time did the defendant indicate that he was planning to commit a robbery or that he was involved with the robbery or shooting (H. 236).

The interview was reduced to a four page written statement at 3:10 A.M., ending at 4:45 A.M., November 19, 2008. No

corrections were made by the defendant when he was given the statement to read, and he signed it. The statement was written by O'Leary, and each page was signed by Hendry and O'Leary (H. 211 - 212).

At 6:15 A.M., after the statement was taken, the defendant was requested to give a video taped statement to an assistant district attorney, but he declined to do so. He signed a refusal form prepared by Hendry, indicating his refusal (H. 213 - 214). Breaks were given to the defendant during the interview, and the defendant was afforded the opportunity to use the bathroom facilities. He was asked if he wanted anything to eat or drink, and he was given a coke. No weapons were displayed and no threats or promises were made to obtain the defendant's waiver of Miranda rights and obtain his written statement. About 5:58 A.M., the defendant telephoned his mother, Esther Ford, from the Homicide Squad (H. 219 - 222).

Hendry did the interrogation of the defendant, and O'Leary took notes. O'Leary prepared a timeline of the interview, but there is no indication of the advisement of rights to the defendant in his notes or the timeline. The people stipulated to that effect. Hendry maintained that there was nothing that transpired during the interview that was not reflected in O'Leary's notes, and the timeline prepared by O'Leary accurately reflected what transpired during the interview (H.

14

224 - 227). The notes reflected that breaks were taken, but the timeline was absent of any reference to any breaks (H. 233 - 234).

At the Homicide Squad, November 19, 2008, 1:55 A.M., Hoctor showed a photo array to Tashawn Wilson. The defendant was already in custody when Wilson made a confirmatory identification of him. Wilson had been at the scene of the shooting, and he knew the defendant. He claimed that Cullum, Rhodes, and the defendant, known as "D-nice,", "Junior," and "Ra Ra" respectively, confronted the victim in the hallway (H. 44 - 46).

At 3:30 A.M., November 19, 2008, "Witness #2," who knew the defendant, gave Hoctor an account of what had occurred on the date of the incident. He was shown a photo array, and he identified the defendant as being in the hallway at the time of the shooting. He also knew Cullum and Rhodes (H. 51 - 55).

At 12:15 P.M., November 19, 2008, Theron Rhodes, implicated in the attempted robbery that resulted in the death of Scott, was in custody. He related that Cullum, the defendant, and he had been in the hallway at the time of the incident. Rhodes, without admitting his involvement, said the defendant pulled out a silver revolver from his sweatshirt or his pants, stepping in front of the victim, and then Rhodes heard shots. Rhodes knew the defendant well, and he identified

15

him from a photo array (H. 56 - 61).

On November 19, 2008, 5:41 P.M., Hoctor claimed to have received a fax that the defense counsel appeared for the defendant, and shortly before, about 4:30 P.M., counsel spoke with Hoctor noting that interrogation of the defendant was to cease. Hoctor claimed he notified that information to O'Leary although the interrogation had already ceased. Hoctor denied that at 6:15 P.M. O'Leary approached the defendant to conduct a video statement, and Hoctor became aware of it. Hoctor claimed that it was 6:15 A.M. albeit it was listed in Hoctor's notes after the A.M. call and fax from the defense counsel (H. 147 - 152).

On November 21, 2008, 9:30 P.M., Garry and Hoctor showed a photo array to "Witness #4." A statement had been taken from this witness related to the incident at 45 Jackson Avenue, and then the witness viewed the array, identifying the defendant (H. 175 - 178).

Defendant's Case

Esther Ford, the mother of the 20 year old defendant, resided at 100 Terrace Avenue, the defendant living with her. She was called by his wife Shakira, about 10:00 P.M., November 18, 2008, that her son was being taken into custody. At the first floor of her building, she was informed by two police officers that her son and others had been arrested for smoking

16

marijuana in the building exit, and she observed an officer carrying a sandwich bag of marijuana (H. 240 - 243 & 250).

An officer told Ford that the defendant was being taken to the police armory to be given a desk appearance ticket. She went to the armory with Shakira, calling from the outside telephone, and an officer responded. He related that it would take some time to release the defendant as others had been arrested with him, and so she went home (H. 243 - 244).

Not hearing anything by midnight, she returned to the armory with Shakira, but no one answered the telephone when she called. Ford then went to the Hempstead Police Department on Center Street with Shakira, and she was told that the defendant was at the Third Precinct. Shakira went into the precinct about 1:30 A.M., November 19, 2008, and she was given a number and informed the defendant was in homicide (H. 245).

The defendant's mother called homicide, being told that the defendant was there. When she inquired as to the reason, she was informed that the defendant would be in Court the next morning, being charged with association. Returning home, Ford received a call from the defendant about 4:00 P.M, and she called an attorney (H. 246 - 247 & 260).

Hearing Decision 6/30/09

The Court determined that there was probable cause for the arrest of the defendant: the totality of circumstances;

17

eyewitnesses; video surveillance tapes; and a cup at the scene with the defendant's fingerprints.

The Court also determined that there was no factual basis to support the conclusion that the identification procedures with the photo arrays were suggestive. Further, some of the photo array identifications were only confirmatory as the defendant was known to the witnesses. The photo arrays were used had persons with characteristics that did not greatly differ from the defendant. Nothing especially drew a viewer's attention to him.

Further, the Court determined that the oral statement provided by the defendant and reduced to a written statement was voluntarily made after a knowing and intelligent waiver of his rights. The defendant's claim that the statement given by the defendant should be suppressed as he was isolated from is family is unpersuasive. He was 20 years old at the time of his arrest, legally an adult, and there was no requirement that his family be present during police interrogation.

THE TRIAL

People's Case

The people contend that on October 24, 2008, extending into the early morning hours of October 25, 2008 (T. 40), there was a birthday party for the eight year old son of Deborah and Jordan Vance (T. 42). It was held at 45 Jackson Avenue, floor B

18

apartment 18, of a building complex near Terrace Avenue (T. 40 & 319), and even uninvited people from the neighborhood came, guests milling around in the hallway (T. 43).

Andre Scott, a 23 year old male from Elmont (T. 40), was invited to the party, and he arrived, wearing jewelry and carrying drugs (T. 44 & 117), with some friends. Around midnight, as Scott and his friends came out of the elevator, into the hallway on floor B, there was an attempt to rob Scott at gunpoint (T. 43 - 44).

Scott was accosted by a group from Terrace Avenue including: the defendant, Rashawn Pender, nicknamed "Ra Ra;" Derek Cullum, nicknamed "D-nice;" and Theron Rhodes, nicknamed "Junior." (T. 44). A male identified by the street name as Stuggs was sought in connection with the incident, but the police were unable to locate and arrest him (T. 45 & 301).

As Scott attempted to flee into a zigzag portion of the hallway, running toward the apartment, he was fatally shot in the left side of his neck (T. 47). The wound perforated the left carotid artery and internal jugular vein (T. 168). Scott, bleeding profusely, tried to escape, tumbling down a staircase (T. 48). Daniel Smith and Shaniqua Houseworth had minor gunshot wounds (T. 48). A bullet fragment, .38 or .357, was removed from Scott's body (T. 141 & 145).

There were cups, bottles, and two hats on the floor in the

19

blood covered hallway (T. 86). A Styrofoam cup, a plastic cup and Scott's black leather Yankee cap (T. 100, 108, & 291), were recovered where the shooting took place (T. 104). The Styrofoam cup had the latent fingerprint of the defendant (T. 129). There was blood on top and underneath the cup (T. 116). There was also blood on the floor and walls splattered from the body of someone at the scene (T. 303).

According to the testimony of Rhodes, an 18 year old witness for the people (T. 198), the defendant, wearing a red hoodie (T. 207 & 211), had a silver revolver (T. 209), and Cullum, also wearing a red hoodie (T. 211), had a black revolver (T. 209). Cullum had decided to rob Scott and his friends (T. 205), and he discussed it with Rhodes, outside the presence of the defendant (T. 221).

Rhodes had not seen the defendant until after Cullum decided to do the robbery (T. 207). Cullum obtained his weapon by making a call to a person named Stuggs (T. 209). The defendant, Cullum, and Stuggs were in the zigzag of the hallway, east of the elevator (T. 208 - 209). Rhodes alerted the defendant and Cullum when Scott and his friends were coming down the hallway (T. 209), toward the zigzag portion, in the direction of the party.

Cullum, in back of Scott the entire time, had stopped Scott from behind, putting the gun to Scott's back (T. 210 &

20

223), and the defendant put the gun in front of Scott (T. 210). Rhodes did not see who fired the shots (T. 210), but he told the police that he believed that it might have been Cullum (T. 225). Rhodes had heard Cullum say during the attempted robbery, "Give it up." (T. 233)

Rhodes and Cullum ran downstairs near the elevator after the shots were fired (T. 228). Cullum used the fire escape to gain entrance into the window of Rhodes' apartment and Rhodes used the fire escape, going to the downstairs exit into his house (T. 211 & 229). Cullum took his clothes off, and he threw them in Rhodes' closet (T. 230). Rhodes did not see what Cullum did with Stuggs' gun, not knowing if Cullum returned it to Stuggs on floor B (T. 232).

Rhodes admittedly served as the "lookout" when Scott and his friends exited the elevator and were confronted, but when the guns were drawn, he walked away (T. 226). He had a cooperation agreement with the district attorney regarding his participation in this felony murder in the second degree to give truthful testimony or face 15 years (T. 202 & 233). Rhodes pled guilty to attempted robbery in the first degree, having a sentence of seven years imposed (T. 200 & 218). He could have faced a sentence of 25 years to life (T. 218).

According to Derek Cullum, a 20 year old witness for the people, he was at the party with his good friend Rhodes (T. 425

21

– 426 & 462), and  he had a discussion with the defendant about a potential robbery. The defendant said, "Good, I got the gun on me," and the defendant showed Cullum a silver revolver. The defendant was wearing a red hoodie, and Cullum was wearing a red hoodie, white designs on the front and back, and a hat, both of them wearing the hood down. (T. 429 – 430, 505, & 513).

Rhodes called Stuggs to get another gun, meeting him downstairs a little before midnight, and  Cullum asked him to see it when they came upstairs, putting the gun in his pocket. When Cullum had the gun, he was near the zigzag area of the hallway with Theron, Stuggs, the defendant, and a few other males, and he did  not know if the defendant still had his gun (T. 431 – 432).

Cullum was not surprised when Rhodes called Stuggs for his gun although he had not seen Rhodes with a gun before. Although Cullum knew how to fire a gun, he never had possession prior to the night of the incident (T. 443 – 444).

At about midnight, everybody started moving toward the zigzag area, and Cullum saw two males, he called victims, walking down the hallway and the defendant pulling out his gun. The defendant, his gun at his side asked,  "Do you know what time it is?" and Cullum then pulled out his gun, claiming he pointed it at the victim's back, from a distance of four feet. One of the accosted males ran, and Cullum returned the gun to

22

Stuggs before shots were fired. The defendant shot the fleeing male in the neck/head area (T. 432 - 433, 454, 472, & 476 - 478).

Cullum claimed that the defendant had taken out his gun, holding it down in his right hand, and he had held his left hand out asking if the victim knew what time it was. When Scott started to run on the defendant's right side, he switched the gun to his left hand, raised it, and shot (T. 506 & 519 - 520).

The defendant had been to the right of the victim, and he had pivoted shooting him (T. 483 - 485). The defendant had pointed his gun around the middle of the neck, more to the left side (T. 508). In the video statement, Cullum never stated that the defendant switched the gun from his right to his left hand. He had stated that he pointed the gun with his right hand (T. 511 - 512).

Cullum ran after the first shot (T. 433). Using the stairs (T. 468), he exited the building near the superintendent's office, running to Rhodes' home at 67 Terrace Avenue and using the fire escape. Entering the window, he opened the door to Rhodes' apartment to admit him (T. 434 - 435). In Cullum's written statement, Rhodes climbed the roof, using the fire escape, and he entered the building, his mother opening the apartment door for him (T.552).

23

During cross-examination, Cullum claimed that Rhodes used a fire escape to enter his apartment as he did not have a key to enter the building (T. 488). There was a buzzer at the front door, but Cullum and Rhodes never attempted to enter Rhodes' building at the front. Rhodes' mother was home, but he did not call her since he believed that she was not home (T. 499).

Cullum denied that he had changed his clothes when he got to Rhodes' apartment (T. 488). In the written statement Cullum stated that he and Rhodes remained in the apartment, spending the night, but on cross-examination, he claimed to have left the apartment with Rhodes, going to the front of the building (T. 489 -492 & 552).

Cullum participated in the robbery attempt and was in possession of a handgun, but he did not believe that he would be arrested (T.447). He expected to get money and had no reservation about doing a robbery (T. 509 - 510). When Cullum was arrested for felony murder, he faced a sentence of 25 years to life. He gave written and video statements, and he entered into a cooperation agreement, pleading guilty to attempted robbery, a class C violent felony, with a 13 year sentence committed if he gave truthful testimony (T. 437 - 438).

Cullum recounted the events of the incident at least three times, the written and video statements and his trial

24

testimony. In the written statement, Cullum claimed that he gave the gun back to Stuggs after the defendant had fired a shot, and Cullum claimed on cross-examination that he had informed the police that was not so, but it was not changed in the statement. In the written statement Cullum claimed that the defendant had pointed his gun when he asked, "Do you know what time it is?" (T. 450 - 455 & 479).

When the victim entered the hallway from the elevator, with his friends, Cullum was with Rhodes and Stuggs. Cullum came around behind the victim slightly to the right, Stuggs was on Cullum's left. In the video statement, Cullum claims that Stuggs was next to him the whole time. The defendant was in the zigzag. Cullum had taken out his gun, pointing it at the victim, when he saw the defendant had taken out his gun. The victim's friend ran, and Cullum claimed that the defendant then shot the victim (T. 457 - 458, 462 - 464, & 474).

Cullum claimed the robbery was planned by Rhodes, the defendant, himself, and others. Cullum was not surprised that Rhodes claimed that the robbery was discussed outside the presence of the defendant (T. 457 - 458). Cullum claimed that he gave the gun back to Stuggs, after only about 10 seconds, as he had a change of heart. In his written statement, Cullum claimed that he gave the gun to Stuggs, after the shooting (T. 552), because Stuggs wanted it, and within about five seconds,

25

he heard shooting, not knowing if Stuggs raised the gun at anyone (T. 465 - 467 & 478).

According to Detective Mark Garry, Shield No. 971, Cullum had informed him, during his interview, that the gun he had held was a black .38 revolver (T. 523, 551, & 559). Garry drew a diagram that he reviewed with Cullum (T. 553), and Cullum acknowledged to Garry that when the defendant announced, "You know what time it is," Cullum was slightly behind Scott, just to the left of Scott's ear (T.559).

On a map of the hallway that had corrections, created during Cullum's interview with Garry, Cullum indicated and signed that Stuggs was with the defendant in the zigzag (T. 469 - 473). During cross-examination, Cullum claimed that Stuggs followed him when he went behind the victim, taking a position standing next to him. In the video statement, Cullum claimed that Stuggs started off in front of the victim, with the defendant, and he walked over to him when the victim started to run, but he denied that on cross-examination (T. 500).

Eight year old Marlon Oliphant, a third grader who was held over to repeat the third grade (T. 178 - 179), claimed that the shooter was wearing a red hoodie with a zipper down the middle and that he met the defendant on the street with his mother, Deborah Pollard Vance (T. 190, 194, & 241). It was acknowledged by Marlon that the "guy' in the red hoodie had

26

come out of the stairwell and started shooting (T. 246).

When he saw the shooter, Marlon had been standing near his apartment (T. 247). Marlon had spoken with the police "a lot" about the incident (T. 191), and he did not know what he was supposed to say as a witness. He believed that if he lied he would be "kicked out of the courtroom." (T. 183)

Color surveillance videos at 100 Terrace Avenue (T. 267 & 276), across the street from the incident, showed the defendant, wearing a red hooded sweatshirt (T. 296), enter the lobby about 12:01 A.M. (T. 52). He got on the elevator, about 12:03 A.M., getting off at the fifth floor where he lived (T. 275 & 297).

At about 12:06 A.M., he appeared on the elevator wearing a gray hooded sweatshirt (T. 53 & 273). No blood was seen on the defendant's person in the surveillance video (T. 279). The only person who could be identified as fleeing from the scene on the surveillance tapes of 45 Jackson Avenue was Rhodes (T.309).

The defendant was arrested on November 18, 2008, about 10:00 P.M. at Terrace Avenue, and he was taken to the Homicide Squad in Mineola (T. 280 - 281). He was the first participant in the incident to be arrested, and Rhodes and Cullum were arrested the following day. Stuggs was not found by the police (T. 299 - 301).

The defendant was taken to the Homicide Squad by the

27

police, and he was placed in an interview room about 10:28 P.M. with Detective Michael O'Leary, Shield No. 256 and Detective James J. Hendry (T. 369 & 374). The defendant was not advised that he was the target of a murder investigation and being charged with felony murder (T. 402). Hendry conducted the interview and O'Leary took notes and also prepared a time line (T. 398 - 399). The defendant was read his Miranda rights (T. 375), going through them in two minutes (T. 404). The interview was not recorded, and after the police took a statement, they asked the defendant to make a video (T. 401).

Henry stated that initially, the defendant denied being at the scene of the incident, relating two versions of going to get Tylenol for his wife that evening T. 383 - 385). Ultimately he admitted going to the party at 45 Jackson Avenue, on the second floor, having a bottle of beer and seeing Junior (Rhodes) and Derek (Cullum) hanging out in the hallway (T. 386).

Derek had informed the defendant that he was going out to get his shit, meaning to get his gun, and Derek and Junior left. When they returned to the hallway, Derek pulled out a silver colored .32 revolver. The defendant heard three shots and someone saying, "You shot the wrong guy." The defendant then ran out of the building (T. 387).

O'Leary did not include the advisement of rights in the

28

notes or timeline (T. 400). The defendant initialed the rights card multiple times, regarding important issues, to memorialize that he had acknowledged receiving his rights. He did not initial the time and date that the rights were administered. The time and date that the rights were administered were added after the defendant acknowledged the card (T. 401).

The defendant was not asked to acknowledge the other versions of that night that he had related and were recorded in O'Leary's notes, prior to admitting his presence at the incident (T. 404). The defendant cooperated at the interview (T. 406). He refused to do a video interview (T. 407).

Detective Edward Hoctor, Shield No. 854, the lead investigating officer of the incident (T. 288 & 315, was informed by Vance that Rhodes had been seen, prior to the shooting, with a silver gun in his pocket (T. 304).

Tashawn Wilson, a witness at the scene had seen Cullum with a gun, Rhodes and the defendant down the hall (T. 316). Hoctor discounted what Wilson said about what had transpired as it was not possible to see what happened from his vantage point in the doorway of the apartment 18B (T. 319)).

Mark Burgess, another witness at the scene, also informed Hoctor that Cullum had a gun, mentioning the involvement of Rhodes and the defendant in the incident, and Hoctor claimed the Burgess information was unreliable (T. 358 - 359). A

statement had also been given to the police by Smith, the witness at the scene who had been shot, but it was recanted (T. 361).

A statement was given to Hoctor by Sherwayne Sealey, when Sealey was arrested on another matter (T. 335). Hoctor had been aware that the murder weapon was a .38 or .357 when Sealey claimed that the defendant pulled out a chrome gun, pointing at the deceased (T. 337 - 338). Hoctor did not recall that Sealey had specified the type of weapon although Sealey's statement specified a .38 or 357 (T. 339). Hoctor believed that Sealey expected a benefit for his statement, but Hoctor was not in a position to offer a benefit (T. 340).

Nothing in Hoctor's investigation had revealed that the defendant had a gun on the night of the incident at the party on the B floor (T. 305). Hoctor claimed that the defendant had been the only one wearing a red sweatshirt. Hoctor did not recall that he had made a note about Cullum also wearing a red sweatshirt although he had crossed Cullum's name out, changing it to be the defendant's name (T. 312 - 313).

Defendant's Case

The defendant testified on his own behalf. He admitted that he had pled guilty to a felony in 2006 and again in 2008. He denied killing Andre Scott, having a gun, and being involved in the robbery on the night of the incident, October 23, 2008

30

(T. 580 -581). The defendant was enrolled in a GED program to help him find a job (T. 595).

The defendant admitted knowing Rhodes and that that "there was no bad blood between them," in response to the people's inquiry (T. 592). The defendant also admitted that he had no problems with Cullum, Deborah Pollard Vance, Vance's son Marlon Oliphant, or Deb (Shaniqua Houseworth's mother). He denied knowing Sherwayne Sealey (T. 593).

Between 10:30 and 11:00 P.M., he had gone to the store to purchase Tylenol for his wife's headache (T. 582), meeting an acquaintance who told him about a party at 45 Jackson Avenue. He stopped off at the building, entering up a stairwell from the back of the building, and he was given a bottle of beer by Jordan Vance, not recalling if he drank from a Styrofoam cup. Derek (Cullum) and Junior (Rhodes) were standing in the hallway, on floor B, among others (T. 584).

The defendant was standing with them smoking weed, drinking beer, and hanging out. Derek and Junior left to get something, and when they returned they stood near the window for two minutes when two guys showed up (T. 582 - 584). The two guys stopped in the middle of the hallway. Derek came up behind Scott, bending down to put the beer down, and Scott started running toward the window (T. 585).

As he started to run, Derek came up behind him. The

31

defendant, his friend Payne on the right side of him, his friend Angelo on the left side of him, moved toward the corner to get out of the way. That is when gunshots were fired, and they ran to the exit, going toward the elevator, after the hallway zigzag (T. 582 - 584).

The defendant went home directly (T.585), entering his building through the lobby and using the elevator, aware that there were video cameras in those areas (T. 585 - 586). When he entered his apartment and removed his red hooded jacket (T. 604), his wife started arguing with him about where he had gone, the defendant not wanting to hear it because of what happened at 45 Jackson Avenue and because his wife got on his nerves (T. 586 - 587).

He started to leave, his wife snatching his jacket, and he grabbed a gray hoodie, one of the hoodies hanging on his bedroom door, going outside (T. 587 - 588). The police never searched his house for the red jacket (T. 588).

When the defendant was arrested, the police did not tell him that he was being charged for murder. They just started asking him questions. He did not waive his rights, just signing the card and agreeing to speak to them, using a map for some of his explanations (T. 589). Other than the written statement, the defendant gave no other versions of the events related to the incident (T. 589).

32

A couple of days after the incident, the defendant met the woman he had referred to as Deb, Shaniqua Houseworth's mother (T. 606), in his written statement. Her daughter had been shot during the incident (T. 607). She needed two dollars for the bus, and the defendant, having no change, gave her $10. She threw parties at her home in the neighborhood (T. 590).

After the statement, the detectives eventually allowed the defendant to call his mother (T. 589). A video interview was offered to the defendant, hours after he gave his statement (T. 590).

Verdict and Sentence

The verdict was **guilty** of count two, murder in the second degree; count three, attempted robbery in the first degree; count five and count six criminal possession of a weapon; **not guilty** of count one, murder in the second degree; and count four, attempted robbery in the first degree (T. 783 – 784).

The defendant was sentenced as a persistent felony offender (S. 17) for murder in the second degree, 25 years to life; attempted robbery in the first degree, 16 years to life; criminal possession of a weapon in the second degree, 16 years to life; and criminal possession of a weapon in the second degree, 16 years to life. The sentences are to run concurrently with each other, and a period of post-release supervision was imposed on the three C felonies (S. 19 – 20).

33

POINT ONE

THE PEOPLE FAILED TO PROVE THE DEFENDANT COMMITTED THE CRIMES CHARGED AS THE EVIDENCE WAS OF INSUFFICIENT WEIGHT, AND THE TESTIMONIES OF THE WITNESSES WERE INCREDIBLE, INCONSISTENT, AND UNRELIABLE, THE VERDICT BEING UNSUPPORTED AND AGAINST THE WEIGHT OF THE EVIDENCE, IN VIOLATION OF THE DEFENDANT'S CONSTITUTIONAL RIGHTS TO BE CONVICTED ONLY WHERE GUILT HAS BEEN ESTABLISHED BEYOND A REASONABLE DOUBT.

The defendant-appellant, Rashawn Pender, maintains his innocence, denying that he is not guilty of the murder in the second degree, attempted robbery in the first degree, and two counts of criminal possession of a weapon in the second degree. As the evidence adduced at trial was of insufficient weight, as well as being inconsistent and contradictory, the people failing to sustain their burden of proving the defendant's guilt beyond a reasonable doubt. See, U.S. Const., Amend. XIV; N.Y. Const., Art. I, Sec. 6; Jackson v. Virginia, 443 U.S. 307, 310 (1979). A careful review of the evidence supports that he is not guilty.

The people's case rested mainly on insufficient and unreliable evidence, and as such, at the conclusion of the people's case, the defense made a motion for a trial order of dismissal, for each of the counts, as there was insufficient evidence, the people failing to prove all the elements of the case beyond a reasonable doubt (T. 574 - 576). See, People v. Thomas, 36 N.Y. 2d 29 (1974).

On making a motion for dismissal, the defense counsel had contended that there was insufficient credible evidence to find a conviction for robbery and murder. There was no credible evidence

34

that the defendant had even been in possession of a weapon. The assault charges related to Shaniqua Houseworth were never established by the people nor were those related to Daniel Smith as neither party testified and no evidence was adduced that their injuries were caused by the defendant.

The Court dismissed the seventh, eighth, ninth, and tenth assault counts (T. 578 - 579), and the jury found the defendant not guilty of count one and count four (T. 783). It is steadfastly maintained by the defendant that he is innocent of count two, murder in the second degree, count three, attempted robbery in the first degree, and counts five and six, criminal possession of a weapon in the second degree, contending that the people failed to prove these charges beyond a reasonable doubt.

The defense application and argument preserved the defendant's present claim as required. See, People v. Bynum, 70 N.Y. 2d 858, 859 (1987); People v. Johnson, 185 A.D. 2d 247 (2d Dept. 1992); People v. Asaro, 182 A.D. 2d 823 (2d Dept. 1992). Here, the defendant's motion and advocacy was specific enough to preserve the defendant's right for appellate review as defined by the Courts. See, People v. Logan, 74 N.Y. 2d 859 (1990); People v. Gomez 67 N.Y. 2d 843 (1986); People v. Dekle, 56 N.Y. 2d 835 (1982); People v. Cardona, 136 A.D. 2d 550 (2d Dept. 1988). The defense clearly made an argument in support of the motion. Accordingly, the defendant has his claim preserved as the defense counsel presented

35

a specific argument in support of the motion.

However, even if the defense failed to preserve any claim that the evidence was insufficient to prove his guilt because his motion failed to specify any such claim, he could still obtain this Court's review of such a claim if the Court exercised its interest of justice jurisdiction as defined in C.P.L. Sec. 470.15 (6) (1). There was insufficient evidence adduced at trial to properly draw inferences that the defendant was guilty of the charges.

Although Appellate Courts must evaluate the proof of the defendant's guilt by examining the evidence "in the light most favorable to the people," People v. Malizia, 82 N.Y. 2d 755, 757 (1984), cert. denied, 469 US 932 (1984), the Court must additionally consider whether the jury's determination of guilt was against the weight of the evidence. C.P.L. 470.15 (5).

Here, the jury verdict cannot be fully supported as it is clearly against the weight of the evidence. See, People v. Bleakley, 69 N.Y. 2d 490, 495 (1987).The Court held in Bleakley that there must be the satisfaction of a legal sufficiency standard. In the instant case, there is no valid line of reasoning or inferences that can be taken from the evidence that could lead to the defendant's conviction for murder, attempted robbery and criminal possession of a weapon.

At the scene, plastic and Styrofoam cups, beer bottles, and cigarette butts, two hats --one of them the murder victim Scott's

36

hat, and marijuana under the body of Scott were recovered T. 104, 117, & 424). No DNA profiles matched the defendant (T. 424). A Styrofoam cup, with a latent fingerprint of the defendant's left middle finger was found (T. 129), in a pool of blood with blood splatter. It did not establish with any certainty that the defendant was in possession of a gun, that he was the shooter, or that he participated in the attempted robbery.

The defendant did not deny his presence at the scene, near to the shooting. He had been drinking a bottle of beer. He did not recall using a cup (T. 598). Any cup the defendant may have used could have been discarded on the floor and been kicked where it was found, as the defendant and others scrambled for safety when Cullum drew a gun. The cup was not tested for any gunshot residue nor was the defendant's red sweatshirt (T. 145).

Marlon Oliphant, an eight year old, testified on behalf of the people, but he could not be a sworn witness based on his age (T. 185). He obviously could not be a credible witness. He was young, and he had been held over in the third grade as he was a poor student (T. 179). Marlon claimed that the defendant was the shooter when he saw him in the street, the next day. He said that the shooter had worn a red hoodie.

Marlon he admitted that a policeman had told him so (T. 191) and that he also had been told that the hoodie had a zipper down the middle (T. 194). On the witness stand, Marlon informed the

Court that he was having trouble as he did not know what he was supposed to say (T. 183). Obviously this child had been coached, and his "testimony" cannot be given any weight whatsoever. Marlon's mother, Deborah Pollard Vance, saw the defendant in a red sweatshirt with a hood, a hoodie, but she did not see him with a gun (T. 153).

Theron Rhodes, known as Junior, as a participant in the incident, facing charges of felony murder and a sentence of 25 years to life (T. 218), had pled guilty to attempted robbery in the first degree, getting a greatly reduced sentence of seven years (T. 200). At the age of 18, he had two felony robberies (T. 212). Clearly, Rhodes was no boy scout and his testimony minimized his participation in the incident, claiming he merely served as a "lookout," walking away when the guns were drawn. Although he was a childhood friend of Derek Cullum (T. 426), Rhodes stated his belief that Cullum was the shooter.

According to Rhodes, the defendant and Derek Cullum were both wearing red hoodies (T. 207 & 211), and they each had a weapon, Cullum, a black revolver, and the defendant, a silver revolver (T. 209). It had been Cullum's idea to commit the robbery, and Rhodes helped him plan it, outside the presence of the defendant (T. 207 & 220). When the shooting took place, Cullum was in back of the victim, pointing the gun at the back of the victim's head (T. 223). Rhodes heard Cullum say, "Give it up." (T. 233), and he had told

the police that he thought Cullum was the shooter (T. 225).

Rhodes stated that Cullum stripped off his clothes, throwing them in a closet in Rhodes' apartment (T. 230). It would appear that Cullum removed his clothes as he was concerned about them being found and connecting him with the murder, very likely being stained with the victim's blood when Cullum shot him. Cullum contradicted Rhodes' claim about him changing his clothes (T. 488). There was no motive for Rhodes to have made his claim about Cullum divesting himself of his clothes and a strong motive for Cullum to have denied it. Cullum and Rhodes had fled from the scene to Rhodes' apartment. They had used the fire escape of Rhodes' building (T. 487), albeit Rhodes' mother had been home and they could have gained admission through the front entrance. No doubt Cullum had avoided the video surveillance cameras in the building in blood stained garments which shed on entering the apartment.

The medical examiner noted that anyone near Scott would have had blood on him, but the surveillance video of the defendant as he entered his building, having fled the scene, does not show any blood on his clothing (T. 168 & 279). The defendant testified that he had changed his red hoodie to a gray one as his wife had grabbed the red one in an effort to deter him from going out after he returned home from the scene (T. 587 -588).

Sherwayne Sealey made a self-serving statement to Hoctor after he was arrested for selling drugs. Sealey claimed that the

39

defendant had pulled out a gun and shot Scott, about a foot away
(T. 338). The defendant would have been bloodied, but there was no
blood discerned on the defendant in the video surveillance tape of
the defendant after the crime. Clearly, Sealey was looking for a
benefit for his "information." (T. 340) Suspiciously, Sealey was
able to label the gun as being a .38 or a .357, the caliber of the
bullet removed from the victim's body, information known to Hoctor
(T. 339). Sealey had been arrested, the evidence of him having sold
narcotics on November 21, 2008 on video, the charges being reduced
to possession of drugs.

Derek Cullum, a participant in the incident, facing charges of
25 years to life, had pled guilty to attempted robbery in the first
degree, getting a sentence of 13 years, a reduction of almost half
of what he had faced (T. 437 - 438). He claimed that the defendant
had been wearing a red hoodie, and he admitted that he had been
too, his having designs (T. 429). Cullum's proffer about discussing
a potential robbery with the defendant (T. 430) was inconsistent
with his good friend Rhodes' statement that the discussion of a
robbery was between them. Rhodes had called a "guy" named Stuggs,
unapprehended participant in this case, who delivered a gun to
Rhodes, and Cullum had taken it from him.

At the trial, Cullum was inconsistent with his written
statement, stating that after the defendant, his gun at his side
asked, Do you know what time it is?" he pointed his gun at the

40

victim, He passed the gun back to Stuggs before any shots were fired (T. 433). In his written statement, the defendant was pointing his gun at Scott when he asked the question (T. 455), and Cullum had given the gun to Stuggs after the defendant had fired. There is a major disparity between when Cullum allegedly passed the gun to Stuggs, and whether the defendant pointed the gun when he asked the question. It destroys any confidence about the truthfulness of his proffer as a witness for the people.

In his trial testimony Cullum's position in the hallway was inconsistent with what he claimed in his video statement. At the trial Cullum contended that when Scott got off the elevator with his friends, he was with Rhodes and Stuggs, and he came around Scott, slightly to the right with Stuggs on Cullum's left (T. 458). In the video statement, Cullum stated that Stuggs was next to him the whole time. There were significant inconsistencies and contradictions on determinative points among Cullum's trial testimony, his written statement, and his video statement.

Cullum admitted that he had familiarity with a gun, knowing how to fire it, but he maintained that the night of the incident was the first time he had possession of one. He had learned how to fire a gun when he was 14 years old from "older guys." (T. 443 – 444). In an interview with a detective, Cullum had informed him that the gun had held at the scene was a .38 revolver (T. 559). It is significant to note that the bullet fragment recovered from

41

Scott's body was from a .38 or a .357 weapon (T. 141 & 145).

Detective Hoctor, the lead detective, was unfairly focused on the defendant as the shooter, claiming that the defendant was the only one who had been wearing a red sweatshirt. In fact, his notes indicated that Cullum had been wearing a red sweatshirt, but he had crossed it out (T. 312 – 313). Cullum himself admitted that he had been wearing a red sweatshirt.

There had been 12 to 24 people in the hallway at the time of the shooting, and in Hoctor's interview with Lucia Vance, she had informed Detective Hoctor that she had seen Rhodes with a silver handgun in his pocket prior to the shooting (T. 304). This undermines Rhodes' claim that it was the defendant who had a silver gun, and it maximizes Rhodes' participation. Rhodes' contention is further undermined as Hoctor's investigation did not reveal any evidence that the defendant had a gun at the incident.

Despite that O'Leary, a seasoned detective and the note taker at the custodial interview of the defendant, claimed that the defendant had given inconsistent information, prior to giving his written statement, there is absolutely no documentation in his notes or in his time timeline to that effect. In fact, the advisement of rights to the defendant at the interview, is a subject of the suppression hearing that the defendant maintains was denied in error by the Court (POINT TWO).

A mere scintilla, or even some proof is insufficient to create

42

an issue of fact. See, People v. Oyola, 6 N.Y. 2d 262, 189 N.Y.S. 203 (1959); People v. Velella, 28 Misc. 2d 579, 216 N.Y.S. 2d 488 (Sup. Ct. New York County, 1961). Neither separately nor in sum does the people's case provide the required confidence that appellant's guilt has been established beyond a reasonable doubt. See, People v. Crudup, 100 A.D. 2d 938, 939 (2d Dept. 1984); People v. Kidd, 76 A.D. 2d 665, 668 (1st Dept. 1980); People v. McIntyre, 71 A.D. 2d 956, 961 (2d Dept. 1979). After viewing the weak evidence proffered by the people in the instant matter, the Court cannot sustain a conviction. Here, as in Crudup, Kidd, and McIntyre, the conviction of the defendant cannot be sustained as the defendant's guilt was not demonstrated beyond a reasonable doubt.

The testimonies of the two key witnesses, Theron Rhodes, and Derek Cullum, the "deal-makers" who supposedly were obliged to tell the truth or lose the deals, were inconsistent and contradictory with each other. All of the evidence proffered by the people's witnesses is inconsistent and contradictory about the details relating to the shooter and the incident. The trial evidence failed to prove that the defendant was guilty of the charges. The evidence was insufficient to establish, beyond a reasonable doubt, that he was the shooter or even a participant in the crime. Clearly, the conviction of the defendant was against the weight of the evidence.

In exercising its statutory authority of a factual review of a case to determine if a verdict is against the weight of the evidence, the Court must consider that a different determination of the jury would have been reasonable based on all the evidence as delineated in C.P.L. 470.15 (5) and as determined in People v. Bleakley, 69 N.Y. 2d 490 (1987). It is clear that the verdict in this case is against the weight of the evidence. The jury did not have a rational basis on which to base their verdict. Its decision is not supported by the record, being against the weight of the evidence.

POINT TWO

THE WRITTEN STATEMENT MADE BY THE DEFENDANT SHOULD HAVE BEEN
SUPPRESSED AS THE EVIDENCE PROFFERED BY THE PEOPLE DID NOT
ESTABLISH THAT THE DEFENDANT WAS GIVEN HIS MIRANDA WARNINGS.

The interview of the defendant by Detective James J. Hendry
was custodial in nature, requiring the administering of Miranda
warnings, according to the guidelines established in this seminal
case, Miranda v. Arizona, 384 U.S. 436 (1966). The Court determined
that the police must provide a set of expedient warnings to ensure
that an individual in custody and subject to interrogation by law
enforcement officers is not deprived of his constitutional rights.

The Court held that if the police intended to use any
statements made by a suspect in court, that suspect must first be
advised of his rights including: the right to remain silent; the
right to be told that anything that he stated could and would be
used in court; the right to the assistance and the presence of an
attorney; and the provision of and attorney if he could not pay for
counsel.

In the case at bar, the people did not establish that the
defendant was given his Miranda warnings, and as such, the oral and
written statement obtained from the defendant should have been
suppressed. Albeit Detective Hendry testified that he administered
the warnings to the defendant, prior to the defendant being
interrogated and giving a statement, his testimony belies this was
the case.

45

Hendry's testimony demonstrated that he had little if any recollection of the interview with the defendant despite having been in charge of the interview, asking the questions as Detective Michael O'Leary took notes. During Hendry's cross-examination, testimony, his responses were almost wholly dependent on the notes taken by O'Leary. Hendry admitted that O'Leary did not note all that transpired during the interview.

In response to the defense counsel's inquiry if O'Leary noted everything that transpired during the interview of the defendant, Hendry replied in the negative (T. 225). Although Hendry did review the notes with O'Leary, he clearly stated, in response to the defense counsel's inquiry what occurred at the interview that was not included in the notes, "I don't know." (H. 225).

Hendry subsequently responded in the negative to the defense counsel's inquiry if anything happened during the interview of the defendant that was not reflected in O'Leary's notes, contradicting his own testimony (T.225). Detective O'Leary's notes makes absolutely no reference to the defendant having been given Miranda warnings.

O'Leary prepared a timeline of the interview of the defendant, and there is no mention whatsoever of Hendry administering the warnings to the defendant in the notes. Assistant District Attorney Christopher Holbrook stipulated to the fact that the notes were absent of the advisement of rights to the defendant (H. 227).

46

Hendry's reliance on O'Leary's notes and his contradiction within his own testimony of what the notes, on which he relied, detailed, do not provide the required evidence that the defendant had been advised of his constitutional rights, prior to his custodial interview.

In addition, Hendry admitted during his cross-examination that the date and time indicated on the notification of rights card, PDCN 233, were curiously added by O'Leary subsequent to the defendant allegedly signing the card. When the defendant supposedly signed the rights card, the date and time were not indicated that he was to be acknowledging (H. 230).

The rule is clear that the Fifth Amendment of the U.S. Constitution requires that Miranda warnings must be given prior to any custodial interrogation regardless of whether an individual is suspected of committing a felony or misdemeanor. See, State v. Buckholtz, 11 Ohio St. 3d 24, 462N.E. 2d 1222.

Although it is custodial interrogation which sets in motion the requirement for Miranda warnings, the right to remain silent and to request assistance of an attorney may attach even as early as the investigatory period. See, Edwards v. Arizona, 451 U.S. 477 (1980).

In the case at bar, evidence obtained from the interview, oral and written statements, should have been suppressed as the people failed to sufficiently establish that the defendant was apprised of

47

his constitutional rights prior to being interviewed. A statement obtained in violation of the defendant's Miranda rights is inadmissible as evidence-in-chief if the trustworthiness of the statements does not satisfy legal standards. See, Harris v. New York, 401 U.S. 222, 91 S.Ct. 643; People v. Ricco, 56 N.Y. 2d 320; See also, People v. Walker. 110 A.D. 2d 730.

In the instant matter, Hendry obtained an oral statement that he reduced to a written statement. Since Hendry's proffer does not establish that he administered warnings to the defendant, violating the defendant's constitutional right, the statement he obtained should have been deemed inadmissible. Thus, the hearing court erred in failing to suppress the defendant's oral and written statements.

## POINT THREE

THE UNDULY HARSH AND EXCESSIVE SENTENCES IMPOSED ON
DEFENDANT SHOULD BE REDUCED IN THE INTEREST OF JUSTICE.

After a trial by jury, the defendant was found guilty and
sentenced as a persistent felony offender as follows: murder in
the second degree, a class A-1 violent felony, P.L. §125.25,
Subdivision 3, 25 years to life; attempted robbery in the first
degree, a class C felony, P.L. §110/160.15, Subdivision 2, 16
years to life; criminal possession of a weapon in the second
degree, a class C felony, P.L. §265.03, Subdivision 3, 16 years to
life; and criminal possession of a weapon in the second degree, a
class C felony, P.L. §265.03, Subdivision 1(b), 16 years to life.
The sentences are to run concurrently with each other, and a period
of post-release supervision was imposed on the three C felonies.

The defendant was found not guilty on the first count, murder
in the second degree, P.L. §125.25, Subdivision 1 and the fourth
count, attempted robbery in the first degree, P.L. §110/160.15,
Subdivision 4 (T. 783). The seventh, eighth, ninth, and tenth
charges against the defendant for two counts of assault in the
second degree, P.L. §120.05, Subdivision 2 and two counts of
assault in the second degree, P.L. §120.05, Subdivision 6,
respectively, were dismissed by the Court, on the defense counsel's
motion for a trial order of dismissal (T.578).

Although the sentences imposed on the defendant are within

49

the statutory limits, they are unduly harsh and excessive, in the extreme. The attempted robbery resulting in the death of Andre Scott cannot be construed in any way as innocent behavior, and it should not be cavalierly condoned. However, the maximum sentences that the defendant received were draconian under the circumstances. The death of Andre Scott was a tragedy, but the defendant's guilt as the shooter is clearly in question as it was against the weight of the evidence (POINT ONE).

The evidence proffered by Derek Cullum clearly demonstrated that he was the shooter in the unfortunate incident, and nonetheless he was given an opportunity to plead to 13 years as a participant. Theron Rhodes, the other participant was given an opportunity to plead to seven years. Cullum and Rhodes received much lesser determinate sentences than the maximum indeterminate sentences of the defendant. The defendant was not given an opportunity to plead and was unjustly labeled the shooter.

The trial court unfairly exercised its discretion in sentencing the defendant to maximum sentences. Thus it is appropriate for this injustice to be corrected. The Court has the power to correct the extreme sentences imposed. "Extraordinary circumstances" warrant interference, by this Court, with the discretion of the lower court, in the interest of justice. See, People v. Roman, 84 A.D. 2d 851 (2d Dept. 1981); People v. Suitte, 90 A.D. 2d 80, 86  (2d Dept. 1982).

50

In the instant case, an examination of the record reveals that the findings of the lower court did not demonstrate a fair and careful consideration of the specific factors of the case, and as such, it is appropriate to give no deference to the capricious sentences imposed on the defendant. Since the defendant was treated unfairly by the lower court, this abuse of discretion, in sentencing the defendant, merits review by the Court and a compelling reason to reduce the defendant's sentences.

In the interest of justice, the defendant's sentences should be reduced as the lower court abused its discretion. See, People v. Suitte, 90 A.D. 2d at 83. Although sentencing is primarily a function of the trial court, People v. Feliz, 58 N.Y. 2d 156, 161 (1983), this Court may modify the sentences "as a matter of discretion in the interest of justice" in accordance with C.P.L. § 470.15 (3).

It is maintained by the defendant-appellant that the Court abused its discretion in imposing these sentences. In the review of the appellant's sentence, this Court has the right to modify the sentences as the trial court clearly abused its sentencing discretion. See, People v. Davis, 92 A.D. 2d 177, 181 (1st Dept. 1983), aff'd., 61 N.Y. 2d 202 (1984); People v. Whiting, 89 A.D. 2d 694 (3d Dept. 1982).

Here, the Court's "sentence-review power may be exercised if the interest of justice warrants, without deference to the

sentencing court." See, People v. Delgado, 80 N.Y. 2d 780 (1992). In the instant matter, the Court's sentence-review power should be invoked as the sentences were a clear abuse of discretion. See, People v. Junco, 43 A.D. 2d 266, 268 (1st Dept.), aff'd., 35 N.Y. 2d 419 (1974), cert. denied, 421 U.S. 951 (1975).

In addition, the Court's sentence-review power may be exercised here, as determined in Delgado, if there are "extraordinary circumstances." See also, People v. Patterson, 83 A.D. 2d 380 (3d Dept. 1981). The remedy of "extraordinary circumstances" to "rectify sentencing disparities, to reach extraordinary situations and to effectively set sentencing criteria" was formulated in People v. Suitte, 90 A.D. 2d 80, 86 (2d Dept. 1980).

In the matter before this Court, "extraordinary circumstances" exist warranting the downward modification of the appellant's sentences. Here, the participants in the incident were granted deference in sentencing despite their culpability and the defendant labeled the shooter being against the weight of the evidence.

The defendant-appellant, 21 years of age at sentencing, struggled throughout his youth with a drug addiction to marijuana and alcoholism, since the age of 14. The only job the he held was in 2004 as a helper at Checkers, earning $5.15 an hour, and he has been financially supported by his mother.

52

As the defendant was a high school "drop out" he has limited employment skills, and he has not been able to obtain employment. Hopefully, the appellant can earn a High School Equivalency Diploma (GED) or receive vocational training during his incarceration. In People v. Carter, 47 A.D. 2d 583 (4th Dept. 1975), the defendant's sentence was reduced where appellant had only completed the ninth grade and had no vocational skills.

The defendant is devoted to his wife and mother, and since the appellant has close connections with them, he can be expected to benefit from these relationships. In People v. Feliciano, 125 A.D. 2d 364 (1st Dept. 1987) and People v. Aquila, 121 A.D. 2d 888 (1st Dept. 1986), courts have cited "strong family ties" in reducing sentences.

Generally, there are four principles that have been accepted as objects of criminal punishment in the Courts of this State: deterrence; rehabilitation; retribution; and isolation. See, People v. Notey, 72 A.D. 2d 279 (1980). Permeating, if not overriding these principles are two other salient factors: "minimum confinement" and "personal status."

It is these latter factors that warrant a downward modification from the maximum sentences that the defendant is now serving in the New York State Department of Correctional Services at Clinton Correctional Facility.

The ABA Standards Relating to Sentencing Alternatives and

53

Procedures, Section 2.2 (relied upon by the Court in Notey)
enunciates, as a general principle of judicial discretion, the
following:

> The sentence imposed in each case should call for
> the minimum amount of custody which is consistent
> with the protection of the public, the gravity of
> the offense and the rehabilitative needs of the
> defendant.

Now it is not the intention of the defendant-appellant
appellant to avoid responsibility or unduly diminish the
seriousness of the matter herein. The offenses, for which the
appellant herein was convicted, are not to be casually condoned.
However, in the realistic panoply of the penal law spectrum, the
defendant's crimes did not warrant the harsh and excessive maximum
sentences in light of the circumstances of the case. A reduction of
sentences is sought in the interest of justice.

Surely, the defendant is in need of a treatment program and
in need of vocational education, but this conviction did not
warrant the extreme indeterminate punishment that he received. This
appellant is deserving of help to recover from his substance abuse
and to receive education expedient to obtain gainful employment.

It is abundantly clear that the Appellate Division may review a
sentence imposed in a criminal case, and upon considering the
relevant facts and circumstances, determine in the exercise of its
discretion that the said sentence, in the case at bar, was unduly
harsh and severe and thereupon reduce said sentence. See, People v.

54

Coleman, 30 N.Y. 2d 582 (1973); People v. Zuckerman, 5 N.Y. 2d 401 (1959).

It is within the authority of the Appellate Division to substitute its sentencing discretion for that of the trial court which failed, in the instant matter, to give  proper balanced consideration to the information at its disposal. C.P.L. § 470.15 (3).; People v. Sanchez, 131 A.D. 2d 606, 608 (2d Dept. 1987).

Appellate courts have declined to disturb a sentence absent "extraordinary circumstances." People v. Brown, 115   A.D. 2d 485, 486 (2d Dept. 1985); People v. Patterson, at 380.

However, it is clear that "extraordinary circumstances" exist here warranting a reduction in the appellant's sentences. There is the urgent, persuasive movement, in the appellant's  favor, of the ABA's "rehabilitative needs" and of the Notey "personal status" criteria. These almost literally clamor for reduced sentences.

It is true that retribution is still a valid sentencing goal, but so too is a defendant's rehabilitative needs. See, People v. Burgh, 89 A.D. 2d 672 (1982). As underscored in Notey, "We cannot ignore the personal status of the defendant as the most significant factor in the sentencing process." Id., at 950.

It is clear that retribution is no longer the dominant objective of criminal law. Zett, New York Criminal Practice, 1973, Volume 6, p. 45, follows the prevalent modern philosophy of penology, "The punishment should fit the offender and not merely

55

the crime."

It is not in keeping with the policy of New York State of using prison sentences to encourage rehabilitation, not to exact punitive vengeance. The sentence should be modified by this Court pursuant to C.P.L. § 470.15 (2) (c). In the interest of justice, the legal minimum or reduced sentences should be considered by this Court.

### CONCLUSION

FOR ALL THE FOREGOING REASONS, THE JUDGMENT OF CONVICTION SHOULD BE REVERSED AND THE INDICTMENT DISMISSED, OR THE CONVICTION REVERSED AND THE CASE REMANDED FOR A NEW TRIAL, OR THE SENTENCE REDUCED.

Respectfully submitted,

Leon H. Tracy
Attorney for Appellant
366 North Broadway, Suite 410-D9
Jericho, New York 11753
(516) 942 - 4233

Dated: August 2010

56

CERTIFICATE OF COMPLIANCE WITH 22 NYCRR SEC. 670.10.3(f)

LEON H. TRACY does hereby certify as follows: This appeal brief was prepared by computer, on behalf of Rashawn Pender, the body of the brief is double-spaced and utilizes a monospaced typeface (Courier New) of 12-point size; the footnotes are single-spaced and utilize the same typeface and point size; and, according to the word count of the word processing system used, the brief contains 12,234 words, exclusive of any pages containing the table of contents, table of citations, proof of service, certificate of compliance, or any authorized addendum containing statutes, rules, regulations, etc.

Dated: Jericho, New York
       August 2010

LEON H. TRACY
18 B ATTORNEY