To Be Argued by
Richard Martell
(15 Minutes)

# NEW YORK SUPREME COURT
## Appellate Division - Second Department

**THE PEOPLE OF THE STATE OF NEW YORK,**

*Respondent,*

*-against-*

**RASHAWN PENDER,**

*Defendant-Appellant.*

A.D. No. 2009-08850
Ind. No. 2822N-08

# RESPONDENT'S BRIEF

**KATHLEEN M. RICE**
District Attorney, Nassau County
Attorney for Respondent
262 Old Country Road
Mineola, New York 11501
(516) 571-3800

Cristin N. Connell
Richard R. Martell
  Assistant District Attorneys
    *of Counsel*

# T A B L E   O F   C O N T E N T S

Page

Preliminary Statement ........................................ i

Statement of Facts
    Introduction ............................................ 1
    The Suppression Hearing ................................. 3
        The People's Case ................................... 3
        The Defense Case .................................... 8
        The Court's Decision ............................... 9

    The Trial
        The People's Case ................................. 10
        Defendant's Motion to Dismiss ..................... 16
        The Defense Case ................................. 16
        The Verdict ...................................... 18
        The Sentencing Proceeding ........................ 18

Point I
    The Verdict Was Legally Sufficient And Was
    Not Against The Weight Of The Evidence ................. 21
        A.    The Evidence Adduced At Trial Was
            Legally Sufficient To Support A Conviction .... 21
        B.    The Verdict Was Supported By The Weight Of
            The Evidence .................................. 27

Point II
    Defendant's Written Statement Of Admission Was
    Voluntarily Given To The Police After A Knowing
    And Intelligent Waiver Of His Constitutional Rights
    And Was, Therefore, Properly Admitted Into Evidence ..... 31

Point III
    The Sentence Imposed Upon Defendant Was Neither
    Unduly Harsh Nor Excessive And, Therefore, Does Not
    Merit Reduction In the Interest of Justice ............. 36

Conclusion ................................................. 41

Certificate of Compliance

# NEW YORK SUPREME COURT

## Appellate Division - Second Department

——••⋙⋘••——

**THE PEOPLE OF THE STATE OF NEW YORK,**

*Respondent,*

*- against -*

**RASHAWN PENDER,**

*Defendant-Appellant.*

——•••——

# RESPONDENT'S BRIEF

——

PRELIMINARY STATEMENT

Defendant appeals from a judgment of the Supreme Court, Nassau County, rendered on September 11, 2009, convicting him after a jury trial, of murder in the second degree (Penal Law § 125.25[3]), attempted robbery in the first degree (Penal Law §§ 110/160.15[2]), and two counts of criminal possession of a weapon in the second degree (Penal Law § 265.03[1][b], [3] and sentencing him to a term of imprisonment of 25 years to life (Robbins, J. at trial and sentence).   Defendant is currently incarcerated.

Defendant had two co-defendants.  Theron Rhodes pled guilty to attempted robbery in the first degree and received a sentence of seven years imprisonment.  Derek Cullum pled guilty to attempted robbery in the first degree and was sentenced to thirteen years imprisonment.  Neither Cullum nor Rhodes filed a notice of appeal.

## S T A T E M E N T   O F   F A C T S

### Introduction

On the evening of October 25, 2008, defendant went to the birthday party of eight-year-old Marvin Oliphant at 45 Jackson Avenue in Hempstead, New York. The party took place in an apartment and spilled out into the hallways of 45 Jackson Avenue, Floor B. While at the party, defendant met with two friends, Theron Rhodes and Derek Cullum and the three decided rob two of the party guests who were unknown to them. In preparation for the robbery, Cullum left the party and returned with a gun. Defendant was already carrying a gun, having brought it to the eight-year-old's party. Defendant and Cullum, armed with their guns, waited in a "zig-zag" shaped section of the hallway while Rhodes acted as a lookout.

As the intended victims of the robbery approached, Rhodes gave defendant and Cullum a warning and they drew their guns. Upon seeing this, one of the intended robbery victims, Andre Scott, started to run. Defendant fired his gun and shot three people. Nine-year-old Shaniqua Houseworth was hit in the arm, as was a man named Daniel Smith. Andre Scott was shot in the neck, and the bullet penetrated his jugular vein and splattered blood on the floor as he ran down the hallway. Scott ran down the stairs toward the first floor, but by the time he reached

1

the bottom of the stairs, he collapsed in a pool of blood. Andre Scott was pronounced dead by a paramedic who arrived at the scene shortly thereafter.

Defendant, along with Cullum and Rhodes, fled the scene, but defendant was identified as the shooter in the police investigation that followed. He was arrested on November 18, 2008. For his conduct, defendant was charged with murder in the second degree (intentional murder), murder in the second degree (felony murder), two counts of attempted robbery in the first degree, two counts of criminal possession of a weapon in the second degree, and four counts of assault in the second degree. On July 31, 2009, after a jury trial, defendant was found guilty of murder in the second degree (Penal Law § 125.25[3]) (felony murder), attempted robbery in the first degree (Penal Law §§ 110/160.15[2]), and two counts of criminal possession of a weapon in the second degree (Penal Law § 265.03[1][b], [3]) (possession of a loaded firearm not in one's home or place of business; possession of a loaded firearm with the intent to use it against another). On September 11, 2009, defendant was sentenced to an indeterminate term of 25 years to life imprisonment for the murder conviction, and received concurrent indeterminate terms of 16 years to life on the remaining charges for which he was convicted.

On appeal, defendant now claims that the verdict was against the weight of the evidence and that his convictions were not supported by legally sufficient evidence. He also claims that his written statement of admission should have been suppressed, and that his sentence is harsh and excessive. None of defendant's claims has merit, and all should be rejected.

The evidence at trial was both abundant and credible, and left no question that a reasonable jury could, as it did, convict defendant as it did. The hearing court's decision should also be affirmed as it was amply supported by the record, and his sentence -- which appropriately reflected the severity of his crimes -- should be similarly upheld.

## The Suppression Hearing

On or about January 26, 2009 defendant filed a motion to suppress evidence, including evidence of a statement he gave to the police following his arrest. The motion was set for a hearing, which took place before the Supreme Court (McCormack, J.) from June 19, 2009 through June 23, 2009.

### The People's Case

Detective EDWARD HOCTOR and Detective MARK GARRY conducted the initial investigation that led to defendant's arrest. They interviewed several witnesses, including Lucia Vance, Gregg

3

Bailey, Daniel Smith, and Tyshawn Wilson (Hoctor: H. 18-48; Garry: H. 170-80). Detective Hoctor obtained videotapes from surveillance systems at 45 Jackson Street and two neighboring buildings. The tape at 100 Terrace Avenue showed that at three minutes after midnight on October 25, 2008, defendant entered 100 Terrace Avenue wearing a red sweatshirt. It showed him boarding the elevator to the fifth floor and returning to the elevator two minutes later wearing a grey sweatshirt (Hoctor: H. 32-33).

Detective Hoctor received a memorandum from the Latent Fingerprint Section of the Nassau County Police Department stating that a white Styrofoam cup recovered at the scene bore latent fingerprints linked to defendant (Hoctor: H. 42). Detective Hoctor interviewed Theron Rhodes who said that defendant was involved in the robbery and murder of Andre Scott. Rhodes also identified defendant in a photo array (Hoctor: H. 57-62).

On November 18, 2008, Detective THOMAS SALERNO placed defendant under arrest in front of 100 Terrace Avenue. Salerno had met defendant on prior occasions. Following the arrest, Salerno took defendant directly to the headquarters of the Homicide Squad of the Nassau County Police Department (Salerno: H. 159-61).

4

On November 18, 2008, Detective JAMES HENDRY and Detective Leary interviewed defendant in a homicide squad interview room. Hendry read defendant his <u>Miranda</u> rights from a pre-printed "notification of rights card" at approximately 10:28 p.m. Defendant signed the card and said that he was willing to speak to the detectives. Detective Leary took notes during the questioning. The interview began with Detective Hendry taking defendant's pedigree information (Hendry: H. 197-206).

Hendry then questioned defendant about Andre Scott's murder. Defendant initially denied being at the party at 45 Jackson Street on October 24, 2008. Hendry confronted defendant, and told him that he knew defendant was at the party, that there were witnesses, and that there was evidence on videotape. Defendant said that he did go to the party, met the man running the party, got a beer, and that he was in the hallway at the party. Defendant said that a person named Derek had a gun and had planned a robbery and that he had heard three shots ring out in the hallway. Detective Leary reduced defendant's statement to the following written statement (Hendry: H. 206-11):

> My name is Rashawn Pender, I am 20 years old. I was born on [sic] 100 Terrace Ave. Apt. 554, Hempstead, New York. I live there with my mother Esther Pender and my wife Chekei Pender.

I have been told by Detective O'Leary that I
have the right to remain silent and that any
statements I make may be used against me in
court.    I have been told that I have the
right to talk with a lawyer before answering
any questions or to have a lawyer present at
any time.   Further, I have been advised that
if I cannot afford to hire a lawyer, one
will be furnished me and I have the right to
keep silent until I have had the chance to
talk with a lawyer.

I   understand   my   rights   and   make   the
following statement freely and voluntarily.
I am willing to give this statement without
talking with a lawyer or having one present.

Last month, back in October the date was
October 25, 2008.  I remembered the incident
but   I   didn't   remember   that   exact   date.
Detective O'Leary provided the date for me.

I had left my building and was going to the
store and I met someone on the block who
told me there was a party at 45 Jackson, I
went to the store first.   I bought Tylenol
and a Philly.  After the store I went to 45
Jackson and went in through the back door.
At that time I was by myself.  I went up the
stairs.      I didn't know which floor the
party was on so I followed the music and the
other people coming in the building.    I
think I was there about 30 minutes before
the shooting.   When I got up the second
floor I saw a guy who I know as Jordan.  The
party was in his apartment.  I saw a bunch
of little kids in the hallway.  Jordan came
up to me "dap" which is greetings, what's
up.  He asked me if I wanted a drink, I said
yea.  He left and came back a short time
later and gave me a bottle of bud.  I was in
the hallway now.   I remember seeing Derrick,
Junior, Brian, Tiny, Paper who is Payton,
Country and Country's brother.  Derrick said
he was going to get his shit which is a
street term for going to get his gun.

Derrick left with Junior.  He was gone about 15 minutes.  When he returned he was with Junior.  Derrick and Junior had come up the stairs.  When they got to where I was they stopped.  I then saw two guys who were not from Hempstead come from where the elevator was.  They started to walk towards where we were.  When these two guys just past [sic] where Derrick was he pulled a gun out it was a 32 revolver.  When he pulled the gun out, I knew that he was going to rob them.  One of the guys runs by me I then heard 2-3 shots.  I then heard someone say "You shot the wrong guy you shot the wrong guy."  I ran towards the stairs and went down the stairs.  I still had my Budweiser bottle in my hand.  I dropped the bud bottle in the exit.  Derrick is a male black, approx 17-18 years old, dark skin, 5'8" skinny.  I have known both of them for 5 or 6 years.

Yesterday I saw the mother of the little girl that was shot.  I think her name is Deb.  She asked me for $2.00 for the bus.  I then gave her $10.00.

After the shooting, I found out that someone got killed.  I didn't know the person that got killed.

I am now at the Homicide Squad where I am giving this statement to Det. O'Leary who is writing it down for me and it is the truth.

Rashawn Pender
100 Terrace Ave., Apt. # 554
Hempstead

(People's Exhibit 11; Hendry: H. 206-13).

The detectives asked defendant if he wanted to give a statement on videotape, but defendant refused.  Neither of the detectives made any promises or threats to defendant.  During

7

the interview, defendant was given a soda to drink and he was given the opportunity to go the bathroom twice.   No weapons were drawn by the detectives during the interview (Hendry: H. 213-21).

### The Defense Case

The defense called ESTHER FORD, defendant's mother.   On the evening of November 18, 2008, she received a phone call to tell her that defendant had been arrested.   She spoke with Hempstead police officers on the first floor of her building who told her that defendant was charged with smoking in the building's exit. Twenty minutes later, she went to the police armory in Hempstead with defendant's wife Shakira.   She returned home after being told that defendant would be issued an appearance ticket and released (Ford: H. 241-44).

According to Ford, she returned to the armory around 12:00 a.m.   She next went to the Hempstead Police Department, but there she was told that defendant had been taken to the Third Precinct police station in Mineola.   When she and Shakira went to the station in Mineola, they were told that defendant had been taken to the Homicide Squad and that he would appear in court the next morning.   She returned home and received a phone call from defendant at 4:00 a.m.   Later that day, she found out

that defendant had been charged with murder and contacted an attorney (Ford: H. 244-47).

### The Court's Decision

The court decided defendant's motion to suppress in a written decision dated June 30, 2009. With regard to the issue of whether the defendant had been properly advised of his Miranda rights, the court found that Detective Hendry read defendant his Miranda rights from a pre-printed card and then gave the card to defendant the card to read to himself. After the portion of the card where it is printed, "Do you understand?" defendant wrote "yes" and wrote his initials. Defendant also indicated on the card that he was willing to answer questions without an attorney present. The rights card was then signed by Detectives Hendry and O'Leary along with defendant's name, the date and time, and the homicide squad case number. Court's decision at 7-8.

The court found that defendant gave his statement after knowingly and voluntarily waiving his Miranda rights. Based on these findings, the court denied defendant's motion to suppress evidence of the statement   Court's decision at 12-13.

<u>The Trial</u>

<u>The People's Case</u>

CLOVER PEREZ had a son named Andre Scott. On October 24, 2008 at about 8 p.m., Andre left home wearing a black leather Yankees cap. It would be the last time his mother would see him alive (Perez: T. 73-74). That same night, DEBORAH POLLARD VANCE held a birthday party for her eight-year-old son MARLON OLIPHANT at 45 Jackson Street in Hempstead (Oliphant: T: 188; Vance: T. 150-51). THERON RHODES, DEREK CULLUM, and defendant were guests at the party and, while there, they had noticed that some of the guests were unfamiliar and the three decided to rob them. Defendant was already carrying a silver revolver, and after making a phone call and briefly leaving the party, Cullum secured a black revolver. Both defendant and Cullum were wearing red hooded sweatshirts (Rhodes: T. 203-09; Cullum: T. 428-31).

While some of the guests congregated in the hallway, the intended victims of the robbery -- Andre Scott and another man -- walked over to the "zig-zag" part of the hallway. Defendant and Cullum were waiting for them and Rhodes gave them a warning. Defendant asked the two men, "you know what time it is?" before defendant and Cullum drew their guns. As Scott turned to run,

defendant shot him in the neck.[1]  Besides Cullum and defendant,
no one else had been carrying a gun (Rhodes: T. 209-11; Cullum:
T. 432-33; Oliphant: T. 190).   After the shooting, defendant,
Rhodes and Cullum ran out of the building and Rhodes and Cullum
entered Rhodes's apartment at 67 Terrace Avenue through the fire
escape (Rhodes: T. 211; Cullum: T. 433-34).[2]

Detective KEVIN CUNNINGHAM responded to a radio call that
shots had been fired at 45 Jackson Street, and became involved
in the investigation of the shooting.   When he arrived at 45
Jackson Street, Cunningham saw Andre Scott's body lying face-
down on the staircase.   Scott's head rested on the floor and his
legs were up on the steps.   Scott's pants had fallen down
between his waist and knees, and his body rested in a large pool
of blood (Cunningham: T. 76-78).   After observing the body,
Cunningham met other officers on the "B floor" where he saw

---

[1] As the investigating detectives later found out, two other
people were shot and wounded by defendant -- Shaniqua Houseworth
and Daniel Smith.

[2] Rhodes had been convicted of attempted robbery in 2007, long
before defendant's trial.   He testified pursuant to a written
cooperation agreement with the District Attorney's Office under
which he would be allowed to plead guilty to attempted robbery
in the first degree, and received a sentence of seven years
imprisonment in exchange for his truthful testimony (Rhodes: T.
199-202).   Cullum also testified under a cooperation agreement,
under which he was allowed to plead guilty to attempted robbery,
with a promised sentence of 13 years' incarceration, in exchange
for his truthful testimony (Cullum: T. 437-40).

blood splattered in the hallway and two hats and two cups left in a pool of blood (Cunningham: T. 79).

On the B floor, Cunningham encountered two people who had been wounded in the shooting. The first was Shaniqua Houseworth, a nine-year-old girl who had been wounded by a bullet that had passed through her right arm. The second was Daniel Smith, a man in his early 20's who also had a superficial gunshot wound in his arm (Cunningham: T. 81-82).

DANIEL O'KEEFE, a Nassau County Police Department paramedic, responded to 45 Jackson Avenue within minutes of hearing an emergency radio call and examined Andre Scott. He found that Scott was not breathing, not responsive, and did not have a pulse. As a result, he pronounced Scott dead and notified the Office of the Medical Examiner of the death (O'Keefe: T. 91-93).

Detective BRUCE SCHURMANN, a member of the Crime Scene Unit, memorialized the crime scene by making a videotape and taking photographs. On the B floor, he documented and retrieved a black leather Yankees cap that he found in a large pool of blood on the floor. In the same area of the hallway, he collected a blood-spattered Styrofoam cup that was spattered with blood (Schurmann: T. 96-100).

Detective ROBERT SCHNURER was assigned to the Electronics Squad of the Nassau County Police Department. On October 25,

12

2008, he responded to 45 Jackson Street and downloaded a videotape of the building's surveillance system.  He also met with LENOX CARTER, the security supervisor at 100 Terrace Avenue.  They recovered the videotaped surveillance from the lobby and elevator of 100 Terrace Avenue (Schnurer: T. 261-63; Carter: T. 235).

Detective EDWARD HOCTOR investigated the surveillance system at 45 Jackson Street and analyzed the video footage recovered from that building and 100 Terrace Avenue.  He found that the surveillance video from 45 Jackson Street was of poor quality and did not cover all of the exits.  The surveillance images from 100 Terrace Avenue, however, showed that defendant entered the elevator on the night of the shooting shortly after midnight wearing a red hooded sweatshirt.  Minutes later, the surveillance showed defendant again in the elevator in a grey hooded sweatshirt (Hoctor: T. 292-98; People's Exhibits 26-27).

DR. ANDREW WOLODZKO, a deputy medical examiner at the Nassau County Medical Examiner's Office conducted the autopsy of Andre Scott.  Wolodzko determined that the cause of death was "a penetrating gunshot wound to the neck with perforations of the left common carotid [sic] artery and internal jugular vein" (Wolodzko: T. 154-60).

Detective SCOTT HICKEY examined the Styrofoam cup that was recovered at 45 Jackson Street and was able to recover latent

13

fingerprints using a technique called "superglue fuming" which involved placing the cup in an airtight chamber where superglue fumes were introduced and bonded with any fingerprints on the object.    Using this technique, he was able to find an identifiable latent fingerprint impression.  He testified, based on his expertise that, to a reasonable degree of scientific certainty, the latent fingerprint impression matched the left middle finger of Rashawn Pender (Hickey: T. 120-29).

Detective SERGEANT ROBERT NEMETH, a member of the Forensic Evidence Bureau, was present at Andre Scott's autopsy and was given a bullet fragment recovered from the body.    After an examination of the evidence he had been given, it was Nemeth's expert opinion that the bullet had been fired from a .38 or .357 gun (Nemeth: T. 137-43).

On November 18, 2008, Detective THOMAS SALERNO arrested defendant and drove him to the Homicide Squad (Salerno: T. 279-82).    Later that night, Detective MICHAEL O'LEARY, a detective in the Homicide Squad, was assigned to interview defendant with Detective Hendry.    Neither detective had a gun in his possession.  Defendant was brought to an interview room where he was read his Miranda rights from a card.  Defendant indicated that he understood those rights and signed the card.  During the interview, Hendry primarily asked questions and O'Leary primarily took notes.  Defendant initially denied being at the

14

party at 45 Jackson, and claimed that, on the night of the incident, he had gone to the store to get his wife some Tylenol, before returning home (O'Leary: T. 372-84).

The first break during the interview took place between 11:35 p.m. and 12:05 a.m.  Following that break, the detectives began to confront defendant with inconsistencies in his account of what had taken place on the night of the shooting.  They told defendant that they had witnesses who had seen him at the party and that fingerprints found at the scene proved that he had been there (O'Leary: T. 384-85).

Defendant then admitted that he had gone to the party and, after getting himself a bottle of beer, he had been hanging out in the hallway with several people.  He said the group included two men named Derek and Junior and that the two later left to "get [Cullum's] gun."  The men returned moments later with a gun that defendant described as a silver-colored .32 revolver. Defendant told the detectives that he then heard two or three shots before someone said "you shot the wrong guy, you shot the wrong guy."  Defendant said that he then ran out of the building and ran home to 100 Terrace Avenue (O'Leary: T. 384-87).

The second break in the interview took place between 12:55 a.m. and 1:25 a.m.  Defendant went to the bathroom and was given a soda.  A third break took place at 2:40 a.m. and defendant was given the opportunity to go to the bathroom again.  A written

15

statement was generated between 3:10 a.m. and 4:45 a.m.  O'Leary wrote out the statement and every page was signed by defendant and the two detectives.  Defendant refused to give a videotaped statement (O'Leary: T. 391-409).


### Defendant's Motion to Dismiss

Following the close of the People's case, defendant moved to dismiss the charges against him on the ground that the prosecution had not present sufficient evidence to support those charges.  The court granted that motion as to counts seven through ten, which charged defendant with assaulting Shaniqua Houseworth and Daniel Smith, but denied it as to the remaining counts (T: 574-79).


### The Defense Case

Defendant RASHAWN PENDER pled guilty to felony charges in other cases in 2006 and 2008.  He claimed that, on October 24, 2008, he did not have a gun, did not participate in a robbery, and did not kill Andre Scott.  He admitted that, on that date, he wore a red hooded sweatshirt with a zipper in the front and a black T-shirt underneath.  Defendant said that he went to the party at 45 Jackson after he heard about it from a friend.  He indicated that he did not recall drinking from a Styrofoam cup, but admitted that it was possible that he had done so.

Defendant saw Derek Cullum and Theron Rhodes at the party and knew that they left at one point to get a gun, but defendant later claimed that he did not know they were planning a robbery. The three men were friends and defendant considered himself to have been on good terms with both Cullum and Rhodes. Defendant was drinking alcohol and smoking marijuana at the party with two other friends named Angelo and Payne when he saw Rhodes and Cullum return (Pender: T. 580-84, 592-93, 603).

Defendant claimed that two men from the party then walked around a bend in the hallway, and Cullum approached them from behind them with a gun. Defendant said that he saw Andre Scott start to run away and soon heard gunshots. Defendant said that he then ran out of the building and ran straight home to his apartment through the lobby of his building. Defendant was aware that there was a surveillance camera in the lobby of his building (Pender: T. 584-86, 602).

According to defendant, when he returned home he argued with his wife over his absence and he told her that he had been at 45 Jackson. Defendant said that he tried to leave during the argument, but his wife snatched his jacket away from him. He said that he then took a gray hooded sweatshirt and went back outside. Defendant admitted that he never called the police to report the shooting (Pender: T. 586-87, 607-08).

17

On November 18, 2008, defendant was arrested in front of his apartment building.  He admitted at trial that he waived his <u>Miranda</u> rights and agreed to talk to the police.  Defendant claimed that, only after he signed a statement, Detective O'Leary let defendant call his mother (Pender: T. 588-89).

## The Verdict

The jury found defendant guilty of count two, murder in the second degree (felony murder), count three, attempted robbery in the first degree, count five, criminal possession of a weapon in the second degree, and count six, criminal possession of a weapon in the second degree (T: 783-84).  The jury found defendant not guilty of count one, murder in the second degree (intentional murder) and count four, attempted robbery in the first degree.

## The Sentencing Proceeding

Defendant was sentenced before the Nassau County Supreme Court (Robbins, J.) on September 11, 2009.  The court first heard from the prosecutor, who noted that defendant had a criminal history that included two separate convictions for attempted assault in the first degree.  The prosecutor requested that the court impose a sentence of 25 years to life imprisonment.  The prosecutor also pointed out that, given his

record, defendant would have faced a minimum sentence of 20 years to life had he merely been convicted of first degree robbery (S: 3-5).

Next, the court heard statements from the victim's mother, Clover Perez, his father, Willie Jones, and his grandmother, Veta Griffith.   Clover Perez told defendant "my life changed forever when you murder [sic] my son," and said that Andre Scott left behind two children, two-year-old Trevon, and a daughter named Kayla who was born a month after Scott's murder and would never see her father.   Willie Jones said that he brought his son, Andre, from Brooklyn to Nassau County "to live a better life," and that his younger son "is distraught with grief as he cannot come to terms with the senseless death of his brother." Veta Griffith also recounted her grief and that of Andre's younger brother, a college student who could not bring himself to come to the sentencing proceeding (S: 5-12).

The court then heard from defense counsel, who argued that defendant should be sentenced to 15 years to life imprisonment because defendant had been acquitted of the intentional murder charge, because his two co-defendants received lesser sentences, and because his young age afforded him the opportunity to reform his life after he has served his sentence (S: 13-16).

For his conviction for murder in the second degree, the court sentenced defendant to a term of imprisonment of 25 years

to life.   For each of his convictions for attempted robbery in the first degree and the two counts of criminal possession of a weapon in the second degree, the court imposed concurrent sentences of 16 years to life imprisonment.   The court also imposed a period of post-release supervision, ordered restitution in the amount of $2,149.62 to benefit the Crime Victims Compensation Board, and imposed applicable surcharges (S: 18-20).

P O I N T   I

THE VERDICT WAS LEGALLY SUFFICIENT AND WAS NOT AGAINST THE WEIGHT OF THE EVIDENCE (responding to defendant's brief, Point I).

The evidence at trial demonstrated that defendant attempted to rob Andre Scott using an illegal weapon, and that, in the course of that attempt, defendant caused his death. Nevertheless, defendant now claims that his conviction should be reversed because the evidence was legally insufficient, or, in the alternative, because the verdict was against the weight of the evidence. These claims are without merit and should be rejected.

A.   The Evidence Adduced At Trial Was Legally Sufficient To Support A Conviction.

In reviewing a legal sufficiency claim, this Court must review the evidence in the light most favorable to the People, and the People are entitled to every reasonable inference that can be drawn from the evidence. See People v. Ford, 66 N.Y.2d 428, 437 (1985); People v. Contes, 60 N.Y.2d 620, 621 (1983); People v. McDonald, 231 A.D.2d 647, 647 (2d Dept. 1996); People v. Ruiz, 211 A.D.2d 829, 830 (2d Dept. 1995). With these principles guiding the analysis, defendant's legal sufficiency claim must be rejected if "any rational trier of fact could have found the essential elements of the crime beyond a reasonable

21

doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979) (emphasis in original); People v. Cabey, 85 N.Y.2d 417, 420 (1995); People v. Contes, 60 N.Y.2d at 621.  That another interpretation of the evidence might support a different conclusion is irrelevant to the assessment of the legal sufficiency of the evidence, as long as some rational trier of fact could have rendered the verdict reached here.  See Ford, 66 N.Y.2d at 437 ("The possibility that someone other than [the defendants] may have committed the crime does not preclude a guilty verdict -- the jury is free to assess the evidence and to reject that which it finds to be unpersuasive").  Applying that law to this case, the evidence presented was legally sufficient to support the verdict which found defendant guilty of four counts.

In order to find defendant guilty of murder in the second degree under a felony murder theory, the jury was required to find that defendant, acting alone or with other persons, committed a robbery, or attempted to commit a robbery, and in the course or furtherance of that robbery, he or another participant caused the death of Andre Scott, a non-participant in the crime.

As to the charge of attempted robbery in the first degree, the People had to prove that defendant attempted to forcibly steal property from Andre Scott, and in the course of commission

of the crime or immediate flight therefrom, defendant or another
participant in the crime was armed with a deadly weapon.

With regard to the first count of criminal possession of a
weapon, a finding of guilt required the jury to find that
defendant possessed a loaded firearm outside his home or place
of business. Finally, a finding of guilt as to the second count
of criminal possession of a weapon required that the jury find
that defendant possessed a loaded firearm with the intent to use
it unlawfully against another.

Here, the jury heard evidence that, if believed, was
sufficient to find defendant guilty of all four charges under
which he was convicted. With regard to the charge of murder in
the second degree, the jury heard Derek Cullum's unambiguous
testimony that defendant shot Andre Scott (Cullum: T. 432-33).
Marlon Oliphant's testified that the man who shot the victim was
wearing a red hooded sweatshirt (Oliphant: T. 190).[3]   Derek
Cullum and Theron Rhodes each testified that both Cullum and
defendant were wearing red hooded sweatshirts (Rhodes: T. 203-
09; Cullum: T. 428-31). Rhodes testified that although he did

_____

[3] Defendant points out that Marlon Oliphant testified before the
jury as an unsworn witness and attacks the credibility of
Oliphant, an eight-year-old witness to a shooting at his
birthday party, because of his academic record (defendant's
brief at 37; Oliphant: T. 187). Defendant ignores Oliphant's
allocution that he understood what the truth was and would tell
the truth and his attacks on the child's credibility are
groundless and egregious (Oliphant: T. 182-83).

not see the shooting, defendant and Cullum were the only people in the hallway carrying guns (Rhodes: T. 209-11). The testimony of paramedic Daniel O'Keefe and Dr. Andrew Wolodzko, the deputy medical examiner, established that Andre Scott died from the gunshot wound he received at defendant's hand (O'Keefe: T. 91-93; Wolodzko: T. 154-60).

The jury also heard evidence that a blood-spattered Styrofoam cup was recovered at the scene that bore defendant's fingerprints, and that it was found near Andre Scott's bloody black Yankees cap (Cunningham: T. 79; Schurmann: T. 96-100; Hickey: T. 120-29). The surveillance videos from 100 Terrace Avenue also showed defendant in the elevator going to his apartment shortly after the shooting. Defendant wore a red hooded sweatshirt, but returned to the elevator minutes later wearing a grey hooded sweatshirt (Hoctor: T. 292-98; People's Exhibits 26-27). All of this evidence provided a sufficient basis for the jury to find that defendant had caused Scott's death during the commission of a felony. Even if the jury did not believe Cullum's claim that defendant, and not Cullum, shot Andre Scott, the evidence was, nonetheless, sufficient to sustain a charge of felony murder, which only requires that the shooting occurred during the commission of a robbery carried out by defendant.

24

As to the charge of attempted robbery, the felony underlying the murder conviction, the jury heard the testimony of Theron Rhodes and Derek Cullum that they had agreed, with defendant, to rob Andre Scott and another party guest and that defendant had drawn his gun for the purpose of committing that robbery (Rhodes: T. 209-11; Cullum: T. 432-33). The jury was also given defendant's statement, in which he admitted that he knew that Cullum was going to get a gun before the shooting (O'Leary: T. 384-409).

With regard to the charges of criminal possession of a weapon, the testimony given by Rhodes and Cullum, defendant's statement, the fingerprint and video surveillance evidence placing defendant at the scene, and the evidence showing that Andre Scott was killed by a bullet, demonstrated that defendant was carrying a gun, that the gun was loaded, that defendant was not in his home or place of business, and that defendant intended to use that gun against another (Rhodes: T. 209-11; Cullum: T. 432-33; O'Keefe: T. 91-93; Wolodzko: T. 154-60).

Defendant's remaining arguments to the contrary also fail to demonstrate that the evidence was insufficient to convict defendant. Defendant notes that the people did not present sufficient evidence as to the assault charges stemming from the shootings of Shaniqua Houseworth and Daniel Smith (defendant's brief at 35). These charges were dismissed at trial, and so

25

their sufficiency is irrelevant here (T: 574-79). Defendant also argues that if defendant had shot Andre Scott, there would have been blood visible on his clothing in the surveillance evidence introduced at trial (defendant's brief at 39). This argument is baseless for several reasons. First, any blood that might have splattered onto defendant may not have been visible on his red hooded sweatshirt, particularly given the quality of the surveillance images. Second, defendant states that "[t]he medical examiner noted that anyone near Scott would have had blood on him" (defendant's brief at 39). This statement misconstrues Dr. Wolodzko's testimony. On cross-examination, the following colloquy took place between defense counsel and Dr. Wolodzko:

> Q. If a person was standing right next to the victim when he received that wound is there a good chance that he would have blood on him?
>
> A. It depends on how much clothing there was in between the wound and the person next to the victim.
>
> Q. If there is blood at the scene surrounding the victim, is it fair to say that that blood would have come out of his body in a manner - withdrawn. If he was standing next to him and the blood was reaching the floor he would probably get wet too, right?
>
> A. I really can't say that. I really don't know. I can't answer that.

(Wolodzko: T. 168-69). Even if there had been testimony that defendant was "right next to" Andre Scott at the time of the shooting, which there was not, Dr. Wolodzko testified that that the evidence did not show whether defendant would have had blood visible on his clothing. Defendant's arguments that the evidence was insufficient are, therefore, meritless and should be rejected by the Court.

In sum, the evidence was more than sufficient to establish that defendant, along with Theron Rhodes and Derek Cullum, attempted to rob Andre Scott and that in the process, Scott was shot and killed by either defendant or Cullum. The evidence was also sufficient to establish that defendant possessed a loaded weapon and that he possessed it with the intent to use it against another.

B.   The Verdict Was Supported By The Weight Of The Evidence.

This Court should also reject defendant's argument that the verdict was against the weight of the evidence. Given the abundance of evidence demonstrating defendant's guilt, defendant's claims are entirely meritless. Where, based on all the credible evidence, a finding different from that of the factfinder would not have been unreasonable, this Court must weigh the relative probative force of conflicting testimony, review any inferences that may be drawn from the evidence, and

evaluate the strength of such conclusions. *See People v. Danielson*, 9 N.Y.3d 342, 348 (2007); *People v. Romero*, 7 N.Y.3d 633, 644-45 (2006); *People v. Cahill*, 2 N.Y.3d 14, 57-58 (2003). This Court must then decide whether, based on the weight of the credible evidence, the factfinder was justified in finding defendant guilty beyond a reasonable doubt. *See People v. Danielson*, 9 N.Y.3d at 348; *People v. Crum*, 272 N.Y.348, 350 (1936). If the trier of fact has failed to give the evidence the weight it should have been accorded, the appellate court may set aside the verdict. *See People v. Bleakley*, 69 N.Y.2d 490, 495 (1987).

This review, however, is not an "open invitation" for a court to substitute its own judgment for the trier of fact, who saw and heard the witnesses. *People v. Cahill*, 2 N.Y.3d at 58. Issues of credibility, as well as the weight to be accorded to the evidence presented, are primarily questions to be determined by the factfinder, who saw and heard the witnesses. *See People v. Bleakley*, 69 N.Y.2d at 495. Thus, this Court must give great deference to the factfinder's determination. C.P.L. § 470.15(5); *People v. Romero*, 7 N.Y.3d at 645 (2006); *People v. Cahill*, 2 N.Y.3d at 57-58 (2003); *People v. Bleakly*, 69 N.Y.2d at 495.

Here, the credible evidence supported defendant's convictions, and any inconsistencies in the testimony offered as

part of the People's case were properly resolved by the jury in favor of the People.   Defendant's arguments to the contrary do not provide a basis for overturning the verdict.   For example, although defendant now complains that no DNA evidence was introduced, he acknowledges that he did not deny his presence at the scene (defendant's brief at 37; Pender: T. 583).

While defendant attempts to paint Cullum and Rhodes as lacking in credibility (defendant's brief at 38-42), owing to their cooperation agreements with the District Attorney, they testified consistently that defendant had a gun, and that he participated in the planning and execution of the aborted robbery of Andre Scott.

In any event, the jury knew of their plea agreements and still chose to credit their testimony (Rhodes: T. 199-202; Cullum: T. 437-40).   To the extent that there were any inconsistencies in the minor details of the testimony given by Cullum and Rhodes, the jury nonetheless properly found the testimony implicating defendant to have been credible.   The jury also heard the defendant's testimony, but plainly chose to credit the testimony of Cullum, Rhodes, and the other witnesses over defendant's own self-serving story.

Although defendant argues that the shooter was Cullum and not defendant (defendant's brief at 39), his claim is now immaterial because the jury found defendant not guilty of

intentional murder under count one, but did convict him of felony murder under count two.   Regardless of whether it was defendant or Cullum who pulled the trigger, defendant's conviction for felony murder was supported by the evidence, as discussed more fully above.   The testimony of the eyewitnesses, standing alone, provided a sufficient basis for a finding of guilt.   In combination with the physical evidence placing him at the scene, as well as defendant's own admission that he knew Cullum had left the party to retrieve a gun, the jury's finding of guilt had ample justification.

In sum, the evidence was legally sufficient to support defendant's conviction, and the verdict was not against the weight of the evidence.   Accordingly, defendant's contentions to the contrary should be rejected as meritless.

## P O I N T   II

DEFENDANT'S WRITTEN STATEMENT OF ADMISSION WAS VOLUNTARILY GIVEN TO THE POLICE AFTER A KNOWING AND INTELLIGENT WAIVER OF HIS CONSTITUTIONAL RIGHTS AND WAS, THEREFORE, PROPERLY ADMITTED INTO EVIDENCE (responding to defendant's brief, Point II).

Contrary to defendant's claims, the hearing court properly denied that branch of defendant's pretrial motion requesting suppression of statements he made to police after he was advised of his Miranda rights (see Miranda v. Arizona, 384 U.S. 436 [1966]). At the suppression hearing, the People called four witnesses, including two detectives, who testified that defendant was read his Miranda rights and signed a "rights card" indicating that he understood his rights and was willing to speak to them outside the presence of an attorney. Defendant's claim must fail, and the order of the hearing court should be affirmed because it was supported by plentiful evidence in the record. See People v. Esmail, 260 A.D.2d 186 (2d Dept. 1999).

A court generally must look to the totality of the circumstances to determine the voluntariness of an inculpatory statement. People v. Gega, 74 A.D.3d 1229 (2d Dept. 2010) (citing People v. Anderson, 42 N.Y.2d 35, 38 [1977]). "The factors to be examined in determining the totality of the circumstances surrounding a defendant's confession include the duration and conditions of detention, the attitude of the police

toward the defendant, and the age, physical state, and mental state of the defendant." Id. (citing People v. Baker, 208 A.D.2d 758, 758-59 [2d Dept. 1994], People v. McAvoy, 142 A.D.2d 605 [2d Dept. 1998], People v. Ross, 134 A.D.2d 298, 299, [2d Dept. 1987]). A Miranda waiver is effective "so long as the immediate import of those warnings is comprehended." People v. Singh, 285 A.D.2d 563, 564 (2d Dept. 2001); People v. Alexandre, 215 A.D.2d 488 (2d Dept. 1995).

As this Court has repeatedly held, the decision of the hearing court should be afforded great deference because it had the opportunity to see and hear the witnesses. See People v. Heitman, 282 A.D.2d 619, 620 (2d Dept. 2001); People v. Ellerbe, 265 A.D.2d 569 (2d Dept. 1999); People v. Washington, 182 A.D.2d 791 (2d Dept. 1992); People v. Oates, 104 A.D.2d 907, 910 (2d Dept. 1984); see also People v. Prochilo, 41 N.Y.2d 759, 761 (1977). Issues of credibility should primarily be determined by the hearing court and, in the event the proof permits the drawing of conflicting inferences, the hearing court's determination should be upheld unless unsupported by the evidence. See People v. Davis, 221 A.D.2d 358, 359 (2d Dept. 1995); People v. Oates, 104 A.D.2d at 910. To put it another way, the judgment of the hearing court should be reversed only where the factual findings are manifestly erroneous or so plainly unsupported by the evidence that the interests of

justice necessitate their nullification, or where the hearing testimony has "all appearances of having been patently tailored to nullify constitutional objections." <u>People v. Garafolo</u>, 44 A.D.2d 86, 88 (2d Dept. 1974).

Here, the decision of the hearing court was fully supported by the evidence offered at the suppression hearing. There was nothing clearly erroneous, or even remotely suspect, in the hearing court's findings. Detective Hendry testified that he read defendant his <u>Miranda</u> rights at 10:28 p.m. (Hendry: H. 198). Defendant signed the card and said that he was willing to speak with the detectives (Hendry: H. 198). The card with defendant's signature as well as the written statement indicating that defendant waived his <u>Miranda</u> rights were both admitted into evidence (Hendry: H. 203, 213; People's Exhibits 10-11). Following this statement, the detectives asked defendant if he was willing to give a statement on video and defendant refused (Hendry: H. 213). During the interview, defendant was given a soda and was allowed to use the bathroom twice (Hendry: H. 219). The interview concluded at approximately 6:15 a.m. (Hendry: H. 213-14. Although the defense introduced testimony from defendant's mother (Ford: H. 241-47), there was no evidence before the hearing court to demonstrate that defendant's statement was the product of coercion or that it was otherwise involuntarily given.

Defendant's contention that the court erred by finding that defendant voluntarily waived his <u>Miranda</u> rights fails in light of the evidence.   Defendant's chief contention is that the hearing court erred in finding that Detective Hendry testified credibly when he stated that defendant voluntarily waived his rights (defendant's brief at 46).   In support of this claim, defendant points out that Detective Hendry stated that he relied on the notes of Detective O'Leary in order to refresh his memory.   Defendant's argument, however, ignores the rule that such credibility determinations are left to the court hearing the evidence.   <u>See</u> <u>People v. Baliukonis</u>, 35 A.D.3d 626, 627 (2nd Dept. 2006) (credibility determinations by a hearing court "are entitled to great deference on appeal and will not be disturbed unless clearly supported by the record").  Here, the testimony of Detective Hendry, if believed, clearly established that defendant voluntarily waived his rights.   The hearing court, which had the opportunity to hear and see this testimony, was in the best position to make this credibility determination.

Based on the evidence which the hearing court saw and heard, it found that defendant was advised of his rights using a <u>Miranda</u> rights card and that he had acknowledged those rights in writing.   Court's decision at 7-8.   The court found that the detectives also signed the card and marked the date and time.   Court's decision at 8.   The court concluded that "[t]he oral

34

statements made by the defendant during the interview at the homicide squad by Detective Hendry and O'Leary on November 18th – 19th, 2008 which were then reduced to a written statement were voluntarily made after a knowing and intelligent waiver of his Miranda warnings." Court's decision at 12.  Defendant provides no basis for this Court to upset that finding.

In light of the great deference to be afforded the hearing court's decision (Baliukonis, 35 A.D.3d at 627), and because the record clearly supports that decision and shows that defendant did waive his Miranda rights, defendant's claims should be rejected.

## P O I N T   III

THE SENTENCE IMPOSED UPON DEFENDANT WAS NEITHER UNDULY HARSH NOR EXCESSIVE AND, THEREFORE, DOES NOT MERIT REDUCTION IN THE INTEREST OF JUSTICE (responding to defendant's brief, Point III).

On July 31, 2009, defendant was convicted, after a jury trial, of one count of murder in the second degree (Penal Law § 125.25[3]), one count of attempted robbery in the first degree (Penal Law §§ 110/160.15[2]), and two counts of criminal possession of a weapon in the second degree (Penal Law § 265.03[1][b], [3]).  On September 11, 2009, defendant was sentenced to an indeterminate term of twenty-five years to life imprisonment.  Defendant now claims that his sentence is excessive and is seeking a reduction in the interest of justice.

There is no valid reason to merit a modification of defendant's sentence in the interest of justice.  Indeed, defendant's sentence was entirely appropriate in light of all of the circumstances, including the brutal and reckless manner in which Andre Scott was murdered, defendant's callous behavior after the crime was committed, his criminal history, and his evident lack of remorse.

Sentencing is a function of the trial court and a task which is left to the discretion of the court only after consideration of certain facts including, but not limited to,

the crime(s) charged, the particular circumstances of defendant's history and behavior, and the goal(s) sought in imposing a particular punishment, "i.e. protection, rehabilitation, and deterrence." See People v. Avery, 85 N.Y.2d 503, 506 (1995), see also People v. Farrar, 52 N.Y.2d 302, 305 (1981). Given the criteria set forth above, the "trial court is in the most advantageous position to determine the proper sentence, having observed the defendant and being intimately familiar with the facts and circumstances underlying the conviction." People v. Kerner, 55 A.D.2d 608 (2d. Dept. 1976).

In fashioning a lawful and just sentence, the court here clearly considered all of the relevant criteria. It presided over defendant's trial, listened to testimony of many witnesses, and reviewed all of the relevant evidence. The trial court, therefore, was in an obvious position to properly gauge the severity of defendant's crime, his credibility, including the sincerity of his expressed remorse, and his criminal history. After considering all of these factors, the court properly, and legally decided that defendant's actions leading up to the murder, the murder itself, and his subsequent behavior merited no less than the maximum sentence permitted by law. See Penal Law §§ 70.00(2)(a), (3)(a)(1); 125.25; see also People v. Byers, 254 A.D.2d 494 (2d Dept. 1998).

Nevertheless, this Court may modify an otherwise legal sentence in the interest of justice, where it is deemed to be "unduly harsh or severe." C.P.L. § 470.15(2)(c), (6)(b). Here, however, defendant's sentence was neither harsh nor excessive, and defendant has not shown otherwise. Thus, there is no need for this Court to modify the prison sentence imposed upon defendant by the sentencing court.

Defendant's argument for a reduction of sentence in the interest of justice is wholly without merit and borders on preposterous. Although defendant provides this Court with what he believes to be mitigating factors, such as his apparent drug addiction (defendant's brief at 52-53), he omits several very important factors that highlight the heinousness of his crime.

To begin, defendant's crime demonstrated a callous indifference to human life. Defendant, using an illegal weapon, participated in a robbery that resulted in a shooting in a hallway filled with people including children. There was never any allegation by defendant or any of the witnesses that defendant's actions were provoked or motivated by self-defense. The robbery, which led to a murder, was premeditated and planned with others, and he carried it out by laying in wait for his victims.

Finally, defendant's criminal history, which includes convictions for assault in the second degree, criminal

38

possession of a weapon in the second degree, and attempted assault in the first degree, demonstrates that the instant crime was not an "aberration from a life pattern of non-violent, law abiding behavior and stable family life" that merits intervention by this Court. People v. Thompson, 60 N.Y.2d 513, 518 (1983). Defendant's history, in fact, demonstrates a general proclivity toward putting his needs and desires over the accepted norms of society and a specific tendency towards acts of violence. Defendant therefore, is not entitled to a modification of his sentence in the interest of justice. Indeed, justice was served when the sentencing court exercised sound discretion in imposing the maximum term permissible by law; incarceration was clearly the only way to adequately protect society from this defendant and his violent whims. Defendant is a repeat offender whose crimes have become progressively more serious, culminating in the taking another's life; he is not a one-time offender who violated the law because he has an addiction to alcohol and drugs.

In sum, defendant's challenge to his sentence is meritless, especially in light of the circumstances surrounding this case. Despite defendant's belief that his sentence was excessive, the applicable statutes and case law demonstrate that the trial court acted fairly, prudently, and absolutely within its sound discretion. Long-term imprisonment was appropriate and

necessary for someone who, with a history of committing violent crimes, committed this murder. Accordingly, the sentence imposed by the trial court should not be disturbed by this Court.

## CONCLUSION

### DEFENDANT'S JUDGMENT OF CONVICTION SHOULD BE AFFIRMED.

Dated:    Mineola, New York
          November 10, 2010

Respectfully submitted,

Kathleen M. Rice
District Attorney, Nassau County
Attorney for Respondent
262 Old Country Road
Mineola, New York 11501
(516) 571-3800

Cristin N. Connell
Richard R. Martell
   Assistant District Attorneys
      Of Counsel

41

**CERTIFICATE OF COMPLIANCE WITH 22 NYCRR § 670.10.3 (f)**

RICHARD MARTELL does hereby certify as follows: This brief was prepared be computer; the body of the brief is double-spaced and utilizes a monospaced typeface (Dark Courier) of a 12-point size; the footnotes are single-spaced and utilize the same typeface and point size; and, according to the word count of the word processing system used (Microsoft Word 12.2.3), the brief contains 8,678 words, exclusive of the cover, table of contents, proof of service, and certificate of compliance.

Dated:     Mineola, New York
           November 10, 2010

                              RICHARD MARTELL
                              Assistant District Attorney